960 A.2d 666

**Robert L. THOMAS**

v.

**STATE of Maryland.**

**No. 921, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Dec. 1, 2008.

Brian L. Zavin (Nancy S. Forster, Public Defender, on brief), for Appellant.

Thomas M. McDonough (Robert A. Rohrbaugh, State Prosecutor, on brief), Towson, for Appellee.

Panel: DAVIS, EYLER, DEBORAH S., MEREDITH, JJ.

DAVIS, J.

Robert L. Thomas, appellant, was tried by a jury in the Circuit Court for Prince George's County (Smith, J.) from August 14 to 23, 2006 on charges of bribery, conspiracy to commit bribery and conspiracy to commit theft. The jury convicted appellant of conspiracy to commit bribery and bribery, but acquitted him of conspiracy to commit theft. On May 11, 2007, appellant was sentenced to twelve years in prison, with all but thirty months suspended, in lieu of five years supervised probation. Appellant was also ordered to pay $10,000 in restitution.

Appellant appeals his conviction and presents three questions for this Court's review:

I. Were the trial court's instructions on the elements of bribery incorrect and misleading?

II. Did the trial court err by allowing a witness for the State to testify that, in his opinion, appellant had influence over the awarding of contracts with the county?

III. Did the trial court err by denying appellant's motion to dismiss Count II of the charging document for failure to state an offense?

For the reasons that follow, we answer all three questions in the negative. Accordingly, we affirm the judgment of the circuit court.

## FACTUAL BACKGROUND

Appellant was hired in December 2003 as the Deputy Director of the Prince George's County Office of Central Services. In that capacity, appellant managed the County's fleet and facilities. Floyd Holt, another deputy director, was responsible for procurement.

The State alleged that appellant solicited bribes and engaged in a conspiracy to bribe Interior Systems, Inc. (ISI), in exchange for appellant's efforts to influence the awarding of a County security management system contract to another company, ADT/Tyco, which would subsequently employ ISI as a subcontractor. The two other individuals alleged to have engaged in this conspiracy with appellant were Paul Wright and Robert Isom.

Appellant's trial lasted several days and produced several hundred pages of testimony. We shall recount below only those facts necessary for an understanding of our assessment of the issues raised by appellant to this Court.

## A. The Process of Awarding Contracts

Pamela Piper, Director of the Office of Central Services and Deputy Chief Administrative Officer for Government Internal Support, testified that she was the purchasing agent for the County with sole legal authority to enter into contracts on behalf of the County. Once a County agency requests certain goods or services, Piper may, *inter alia*, issue a request for bids (whereby the contract is awarded to the lowest bidder) or a request for proposals (whereby vendors submit proposals describing the provision of goods or services and the contract is awarded based on a number of factors not necessarily limited to price).

Under the latter method, proposals are reviewed by a proposal analysis group (PAG) consisting of, *inter alia*, a "procurement official" and five voting members. Each member of the PAG rates each proposal individually according to agreed-upon criteria. The procurement official then submits a final score for the proposal, along with the group's recommendation, to the Director. Once the Director approves the recommendation, a contract is drafted which, after other intervening steps not relevant here, is signed by the County and the successful vendor.

In June 2003, prior to Piper's appointment, the County issued an invitation for bids to install a security management system in two County buildings. The invitation for bids also indicated that the County would consider expanding the contract to approximately 140 buildings should additional funding become available. The bidding process took place and the procurement official assigned to the matter, Frederick Dorsey, recommended an award to the lowest bidder. Piper, however, retracted the invitation for bids when she was appointed to her position.

In February 2004, the Office of Central Services issued a request for proposals to install the aforementioned security management system. Piper appointed the requisite five members to the PAG tasked with the proposal review process. In July 2004, the PAG unanimously recommended awarding the

contract to the same company that had been the lowest bidder under the invitation to bid process. However, Piper again rejected the PAG recommendation for multiple reasons, including the fact that she learned from appellant, who was not part of the PAG at that time, that a PAG member had a possible business relationship with the lowest bidding company. Subsequently, interested vendors were requested to give oral presentations regarding their proposals. To accomplish that end, in September 2004, Piper replaced two members of the PAG with appellant and Floyd Holt. Several vendors, including ADT/Tyco, gave presentations as requested. ISI, as a prospective subcontractor, participated in ADT/Tyco's presentation and proposal.

Dorsey, the procurement official assigned to the PAG, testified that appellant and Holt asked him to see the scoring of the other PAG members of the various proposals prior to submitting their final scores, which, according to Dorsey, had never previously been done. Appellant, Holt and another member of the group ultimately gave perfect scores to ADT/ Tyco's proposal. The other two members of the group also gave relatively high scores to ADT/Tyco's proposal. In November 2004, Piper was notified of the PAG's unanimous recommendation to award the contract to ADT/Tyco, with ISI as a subcontractor.

The events that form the basis for the criminal charges against appellant occurred after ADT/Tyco's oral presentation in September 2004 and are set forth below.

## B. Initial Meeting and Commencement of Investigation

Melvin Pulley was ISI's Director of Telecommunications in 2004. In 2004, Dallas Evans was ISI's president. Both Pulley and Evans attended the ADT/Tyco presentation on September 29, 2004. Although Holt was present at the presentation, appellant was not. Afterwards, Pulley, Evans and others went to a restaurant to celebrate what they believed was a successful presentation. According to Pulley, he encountered Robert Isom at the restaurant. Pulley described Isom as a "social friend of mine." Pulley also knew that Isom

was, at that time, working for Prince George's County. Pulley informed Isom about the presentation and Isom offered to introduce Pulley to appellant. Pulley testified that he followed Isom to another restaurant, where Pulley met appellant for the first time. Appellant told Pulley that he "knew all about ISI and the contract and [that] everyone on their committee worked for him . . . ." Pulley shared some additional information about ISI with appellant. The next day, Isom called Pulley and informed him that "[appellant] wants to know if ISI and ADT will play."

Isom, who ultimately pled guilty to a charge of conspiracy to commit bribery in connection with these events, testified at appellant's trial in exchange for a reduced sentence. His version of this first meeting differed from Pulley's version. According to Isom, he spoke with Evans at the restaurant and not Pulley. Isom added that it was Evans who asked Isom to introduce Pulley to appellant. He admitted, however, to calling Pulley the next day, at the request of appellant, "to see if ISI would play."

On October 1, 2004, Isom called Pulley and arranged a meeting at a restaurant, at appellant's request, between Isom, Pulley and appellant. Isom testified that, before Pulley arrived, appellant told Isom that they would ask ISI for $250,000 and that there would be a "conduit." Pulley testified that, when he arrived at the restaurant, appellant told Pulley he could not talk with him because another panel member was present in the restaurant. According to Pulley, Isom gave him a piece of paper, which stated that appellant could guarantee the contract for a price of $250,000 and that appellant would issue "change orders" so that ISI could recoup that amount. Pulley was told that ISI would have to pay one-half of that amount initially, with the other half due upon the awarding of the contract. According to Isom, appellant advised Pulley of the terms of the deal while Isom only took notes.

Pulley testified that he left the restaurant and reported the incident to Evans, who was then the president of ISI. After a

meeting between ISI's counsel and other ISI employees, the decision was made to report this situation to the relevant authorities.

Isom testified that, over the following weeks, appellant asked him to call Pulley a number of times.

## C. Recorded Phone Conversations

On October 7, 2004, Special Agent John Poliks of the Office of the State Prosecutor met with Pulley at ISI and copied a voice message left on Pulley's cell phone by Isom. This message, played for the jury at trial, consisted of Isom asking Pulley to contact him in order to set up a meeting between Evans and appellant. In Agent Poliks' presence, Pulley called Isom and told him that he had spoken with Evans who "feels that ... that amount's a little steep." Isom replied, "that's no problem," and "we just need to ... get them together."

On October 14, 2004, Agent Poliks again copied five more voice mail messages from Isom to Pulley. These, too, were played for the jury. In one of these messages, Isom gave Pulley a phone number for "the other Bob," ostensibly referring to appellant.

In addition, on October 14, 2004, Evans called appellant with Agent Poliks present. This conversation between appellant and Evans was recorded and played for the jury. During this phone call, Evans told appellant that he had spoken with Pulley and was "trying to understand exactly what the deal is." Appellant responded, "Well[,] I don't want to talk about it on the phone—you understand." When Evans told appellant that ISI "couldn't come up with a number that quick and that soon," appellant responded, "No, no, no, no, no, no we can, we can work with numbers okay." Evans asked appellant "what we would be getting, ah, you know, out of, what, what consideration we'd be getting." Appellant replied, in part, that "there's 144 buildings" that "we gotta add security to," and added, "I'm going, I'm going to make the decision ... then I'm going to send you a letter ... of intent to award...." This conversation took place approximately one month before

Piper was notified of the PAG's unanimous recommendation to award the contract to ADT/Tyco.

Later that day, during a telephone call initiated by Evans, Isom stated, "I was ... informed ... to let you know ... that what we're talking about, he said that can be done ... in 12 months. And he has the conduit." Regarding the money requested from ISI, Isom stated, "we understand that that's kind of steep ... but he just wanted to get assurance [sic] from you." Isom added that "he wants to assure you that he's going to take you on your word ... and ah, just go ahead on and sign and you'll know the job's out there for contractor. Your [sic] gonna get it ah, not only that one ... once you get in here your [sic] going to be the model for the ... county...." Isom also said that he wanted to get a commitment from Evans so that Isom could "take it back to him because you know, he's back and forth in fact he's in, in the office now ... Director's office ... and he got to make a decision today...." Evans responded, "Well, tell him to execute it." Over defense objection, Evans told the jury that, at the time, Evans believed appellant had the authority to influence the awarding of contracts for the County.

### D. Consulting Agreement

As part of the on-going investigation, Agent Poliks and another special agent conducted surveillance of a meeting between Pulley and Isom at a restaurant in Washington, D.C. on October 19, 2004. At that meeting, Isom gave Pulley a manila envelope and instructed Pulley to have Evans review the enclosed document, which consisted of a draft consulting agreement to retain Washington Business Management Consulting Group, LLC (WBMCG) for a fee of $260,000, payable monthly. On October 23, 2004, appellant and Pulley met at another restaurant. Pulley gave appellant a "marked-up" copy of the consulting agreement in an ISI envelope. Appellant took the envelope but did not open it. According to Pulley, appellant told him that "he was going to award the contract the next day to ADT and ISI." A contract was not, in fact, awarded the following day.

WBMCG was a consulting company belonging to Paul Wright, who was also charged with bribery, conspiracy to commit bribery and conspiracy to commit theft. Wright was acquitted of these charges prior to appellant's trial. Wright testified at appellant's trial, pursuant to an agreement with the State to cooperate in an on-going investigation of public corruption in Prince George's County, in exchange for transactional, use and derivative use immunity. According to Wright, he was contacted by appellant in October 2004, when appellant suggested to Wright the possibility of jointly pursuing consulting opportunities. Wright testified that he did not know at the time that appellant was employed by the County. Wright prepared a draft consulting agreement and was surprised when, later that month, appellant returned a completed contract signed by ISI. In addition, Wright maintained that he had never heard of ISI before receiving the agreement from appellant. Nonetheless, he signed the agreement and agreed to attend a meeting with ISI employees on November 1, 2004. He maintained that he never thought the consulting agreement was illegal.

The November 1st meeting was to include appellant, Pulley and William Marcellino, Chief Operating Officer and a principal shareholder of ISI. The FBI prepared a check for $10,000, made to look like a check from ISI, and Marcellino took that check with him to the meeting. Wright testified that appellant called him prior to the meeting to tell him he would not be there, but that Isom would attend. Wright's understanding, based on what appellant told him, was that ISI had already won the contract and that this meeting was to discuss future work. At the meeting, Marcellino gave Wright the check as an initial payment on the consulting agreement with WBMCG. Isom told Pulley and Marcellino that appellant "was going to release the contract that day" and would later issue change orders so that ISI could recoup its expenses.

An award of the contract, however, was not forthcoming. Agent Poliks asked Marcellino to arrange another meeting with appellant on December 6, 2004. Once again, appellant did not attend the meeting. Wright, who attended the meet-

ing at appellant's request, gave Marcellino a copy of a memorandum from Piper to a former member of the PAG, indicating that she had accepted the PAG's recommendation to award the contract to ADT/Tyco.

On January 31, 2005, Pulley met again with Isom, who told him that he was "no longer part of this mess Bob was doing." Wright testified that he also decided to end his involvement in the matter for a number of reasons, including his concern that his business relationship with appellant was not a "good fit." Agent Poliks testified that he made an attempt, to no avail, to meet with Wright under the guise of being a project manager for ISI. Phone records indicated that appellant maintained contact with Isom through January 5, 2005 and with Wright through February 5, 2005.

### E. WBMCG Bank Account

On May 24, 2005, Agent Poliks executed warrant searches of the homes and offices of appellant, Isom and Wright. A number of items were seized from Wright's house, including a copy of the ISI and WBMCG consulting agreement, documents related to WBMCG's business bank account and an invoice prepared by Wright to Marcellino. Agent Rick Barger testified that, when presented with the affidavit accompanying the search warrant, appellant stated that he had no capacity to affect bidding on contracts in the County. Appellant also denied picking anything up from Pulley at the monitored October 23, 2004 meeting. He did admit, however, to doing paid accounting work for Wright's consulting business, WBMCG.

Wright opened a WBMCG business account on November 3, 2004, in which he deposited the $10,000 check given to him by Marcellino. Both Wright and appellant made withdrawals from this account. Wright testified that he would give some or all of his withdrawals to appellant. Wright also testified that he felt appellant took too much money from the WBMCG account. Isom testified that he never received any money for his role in this matter, despite appellant's promise that Isom would be paid $2,000 a month.

Additional facts will be discussed in our analysis as warranted.

## ANALYSIS

### I

Appellant initially argues that the trial court erred when it instructed the jury, over appellant's objection, that "[i]t is not a defense to the crime of bribery that the public employee did not have the actual authority, power, or ability to perform the act for which the money was demanded or received." Appellant argues that this instruction was incorrect and misleading. According to appellant, a correct statement of the law is rather that "it is not a defense [to bribery] that the defendant did not have *expressly or officially prescribed* authority, power, or ability to act *so long as he implicitly had the authority, power, or ability to act in accordance with established custom or practice.*" Appellant contends that he was prejudiced by the alleged erroneous jury instruction because it allowed the jury to convict him of bribery, notwithstanding any reasonable doubt that it might have had as to whether the awarding of contracts was part of appellant's "official duties."

The State counters that appellant was attempting to persuade the jury that he could not be convicted of bribery if he lacked the actual authority to award contracts on behalf of the County. According to the State, this entitled the State to ask for, and receive, a jury instruction stating that the lack of actual authority to perform the act is no defense to bribery. Lack of actual authority, asserts the State, is a defense to bribery *only if* the public employee is acting in a matter *outside* his or her official capacity or *not related to* his or her official duties. When read as a whole, the State posits, the jury instructions correctly conveyed the law on bribery. We agree.

### A. Standard of Review

It is well-settled that "so long as the law is fairly covered by the jury instructions, reviewing courts should not

disturb them." *Smith v. State,* 403 Md. 659, 663, 944 A.2d 505 (2008) (quoting *Farley v. Allstate Ins. Co.,* 355 Md. 34, 46, 733 A.2d 1014 (1999)). On the other hand, if a challenged jury instruction is "ambiguous, misleading or confusing" to jurors, a reversal of the conviction and a new trial on remand is required. *Id.* (internal citations omitted). Jury instructions cannot be read in a vacuum; rather, they must be examined as a whole, in the context of the entire charge to the jury. *Id.* As the Court of Appeals recently reiterated, a reviewing court "will not condemn a charge [to the jury] because of the way in which it is expressed or because an isolated part of it does not seem to do justice to one side or the other." *Id.* (quoting *Morris v. Christopher,* 255 Md. 372, 378, 258 A.2d 172 (1969) (internal citations omitted)).

With this standard of review in mind, we turn to the merits of appellant's challenge to the bribery jury instruction offered at his trial.

## B. Authority to Act and "Official Duties"

At trial, appellant elicited testimony suggesting that he lacked the actual authority to award contracts to vendors. For example, Piper testified on cross-examination that she had the sole legal authority to enter into a contract on behalf of the County. The gravamen of appellant's complaint before this Court is that the jury was incorrectly instructed that the *lack of actual authority* to commit the act for which payment is received is no defense to bribery.

 Appellant was convicted under § 9–201(c) of the Criminal Law (C.L.) Article,[1] which provides, in pertinent part, that a "[a] public employee may not demand or receive a bribe, fee, reward, or testimonial to . . . influence the performance of the official duties of the public employee. . . ." Maryland's bribery statute "embodies the basic elements of the common law without extending its boundaries to persons

---

1. In this opinion, reference will be made to Md.Code Ann., Crim. Law (2002, 2008 Supp.).

outside the ambit of the common law." *State v. Canova,* 278 Md. 483, 491, 365 A.2d 988 (1976) (discussing *Blondes v. State,* 16 Md.App. 165, 294 A.2d 661 (1972) and construing the former Md.Code 1957, art. 27, § 23, a predecessor statute to C.L. § 9–201).[2] Under both the Maryland statute and the common law, "It is essential for a conviction of bribery that the briber must make an attempt to influence the bribee in the performance of his 'official,' 'public' or 'legal' duty." *Richardson v. State,* 63 Md.App. 324, 328, 492 A.2d 932 (1985).

■ Maryland case law instructs that a public employee violates the provisions of the bribery statute by demanding or receiving a bribe to influence the employee's performance of duties that are either *expressly* authorized, *e.g.,* by statute, rule or regulation, or *implicitly* authorized. In *Kable v. State,* 17 Md.App. 16, 299 A.2d 493 (1973), we held that a police officer who accepted $250 in exchange for agreeing to ask an Assistant State's Attorney to enter a *nolle prosequi* as to various motor vehicle offenses was properly found guilty of bribery. *Id.* at 18–19, 299 A.2d 493. We rejected the officer's argument that he was not influenced in the performance of his "official duties" because the State's Attorney, and not the officer, had the actual authority to *nol. pros.* the traffic violations. *Id.* at 19, 299 A.2d 493. We explained:

> In concluding that the appellant was acting within his "official duties"... we "have given the statutory definition of bribery a construction broad enough to cover cases," such as this one, "where a public officer has accepted a bribe to act corruptly in a matter *to which he bears some official relation,* though the act itself *may be technically beyond his official powers or duties.*" Thus, while the actual decision to nol. pros. a traffic violation is one which rests with the State's Attorney of Prince George's County, the right of a

---

**2.** Former Md.Code 1957, art. 27, § 23 prohibited a public officer from demanding or receiving a bribe for the purpose of influencing the public officer in the performance of his or her duties. This later became Md.Code 1957, art. 27, § 22, which was later reenacted, without substantive change, as C.L. § 9–201.

police officer in that County to recommend the nol. pros. of traffic cases in which he brought the original charges must be considered *a responsibility implicitly authorized by custom and circumstance, amounting to an official practice and, consequently, one of his "official duties"* within the language of Article 27, Section 23 of the Code.[3]

*Id.* at 22, 299 A.2d 493 (internal citations omitted) (emphasis added).

Similarly, in *Richardson,* 63 Md.App. at 327, 492 A.2d 932, we upheld the bribery conviction of a defendant who, as a clerk at the State Department of Vital Records, accepted $300 in exchange for blank birth certificates. We emphasized the holding in *Kable* and noted "that it is sufficient that the illegal act requested of the state employee bear some *relation* to his official duties." *Id.* at 333, 492 A.2d 932.

■ Indeed, an isolated statement that "[i]t is not a defense to the crime of bribery that the public employee did not have the actual authority, power or ability to perform the act for which the money was demanded or received," would, without more, give an incomplete picture of Maryland's law on bribery. The lack of actual authority, power or ability to perform the act for which the money is demanded or received *is,* in fact, a defense to bribery, *if* the act for which the public employee accepted the bribe involves a matter to which the public employee *bore no official relation. See also* 12 Am.Jur.2d Bribery § 19 (1997)("The lack of authority of the officer or governmental employee bribed is *not* a defense to the criminal offense of bribery, *so long* as the officer or employee acted in his or her official capacity.") (emphasis added). Perkins and Boyce, Criminal Law 536 (3d ed.1982), agree, stating as follows:

For guilt of bribery it is obviously not necessary, that the act requested be one which the bribee has authority to do, for it is frequently illegal.... If he has the power or ability

---

3. As explained *supra,* Art. 27, § 23 of the Maryland Code was a predecessor statute to C.L. § 9–201.

or apparent ability to comply with the request, no more is needed. And bribery is not precluded by the fact that the bribee is only one member of a board, council or other body, and hence will be unable to bring about the desired result if other members are obstinate. The prevailing view is that bribery may be predicated upon an effort corruptly to influence the action of an officer or public employee provided the act is apparently within the ambit of the general scope of his duties or authority, but not if it is obviously unrelated thereto.

## C. The Challenged Jury Instruction

Based on the foregoing discussion, the challenged portion of the trial court's jury instruction, read out of context, would have the tendency to obscure some of the nuances set forth in *Kable, Richardson* and other authorities discussed *supra.* We do not evaluate jury instructions, however, in a vacuum. We place them in their proper context and assess the jury instructions as a whole to determine whether the instructions fairly covered the law or, conversely, whether they were ambiguous, confusing or misleading to the jurors.

Prior to the jury's deliberations, the trial court instructed the jury, over defense counsel's objection, as follows:

Bribery. To constitute bribery, the State must prove that the defendant was an officer or employee of Prince George's County, who corruptly demanded or received, directly or indirectly, something of value from another *for the purpose of influencing the officer or employee in the performance of his official duties.*

In count one, the defendant is charged with Conspiracy to Commit Bribery. In count two he is charged with Bribery.

Now, in order to prove bribery, the State is not required to prove that payment was in exchange for any particular action by the Prince George's County employee; rather it is sufficient for the State to prove that payments were demanded or received with the intent to influence the conduct of the employee *in relationship to his employment or duty.*

(Emphasis added). The trial court then instructed the jury as
to the charge of conspiracy to commit theft by deception and
explained the elements of a conspiracy. At the end of that
particular charge to the jury, the trial court promulgated the
challenged instruction:

> Now, in order for the State to prove a conspiracy, it is not
> necessary that a formal agreement be shown or that the
> conspiracy agreement as [sic] manifested by formal words
> either written or spoken. An agreement exists if the par-
> ties to a conspiracy passively come to an understanding by
> words or actions with regard to an unlawful act or purpose.
> *It is not a defense to the crime of bribery that the public
> employee did not have the actual authority, power, or
> ability to perform the act for which the money was demand-
> ed or received.*

(Emphasis added).

█ We hold that, read in their entirety, the jury instruc-
tions fairly conveyed Maryland law on bribery. "[W]hen
objection is raised to a court's instruction, attention should not
be focused on a particular portion lifted out of context, but
rather its adequacy is determined by viewing it as a whole."
*Smith,* 403 Md. at 666, 944 A.2d 505 (quoting *State v. Foster,*
263 Md. 388, 397, 283 A.2d 411 (1971)). The jurors here were
instructed that, to convict appellant of bribery, the State was
required to prove, beyond a reasonable doubt, that (1) appel-
lant was an officer or employee of Prince George's County, (2)
appellant corruptly demanded or received, directly or indirect-
ly, something of value from another and (3) this thing of value
was demanded or received for the purpose of influencing the
appellant *in the performance of his official duties.* The
challenged "lack of authority" instruction must be read in that
context. As explained *supra,* even if a particular act is
*technically* beyond a public employee's authority, it is enough
that the public employee accepted a bribe to influence a
matter to which the public employee bears some official
relation. *See Kable,* 17 Md.App. at 22, 299 A.2d 493. The
jury was fully informed that if, for whatever reason, it had
reasonable doubt as to whether the State had proven that the

proscribed act was within the general scope of appellant's "official duties," it was required to acquit appellant of that charge. Any testimony establishing that appellant lacked authority to award contracts on the part of the County was part of the body of evidence the jury was entitled to weigh and consider in determining whether the elements of bribery had, in fact, been established by the State beyond a reasonable doubt.

Appellant further argues that remarks by the State during closing argument,[4] when coupled with the challenged bribery instruction, allowed the jury to believe that it could convict appellant of bribery "even if he was unable to influence the awarding of the contract because he either lacked the power or ability to do so or because the decision to award the contract had already been made before he demanded and received a bribe from ISI." Given the foregoing, such a conclusion by the jury would, in fact, be consistent with the law, as long as it found appellant to have accepted or demanded the bribe for the purposes of influencing him in the performance of his official duties. Appellant does not contest that he was an official member of the PAG, which was tasked with reviewing proposals by vendors in order to make an ultimate recommendation as to the final awarding of the contract.

Finally, we reject appellant's contention that the challenged instruction "created a conflict with the *mens rea* element of bribery." Appellant argues that, if appellant lacked the authority, power or ability to influence the awarding of the contract, he would also likely lack the intent to take any action in exchange for the bribe. This argument is unpersuasive. A public employee may very well choose to accept a bribe with the intent that the bribe influence his or her performance of

---

4. Appellant points specifically to the following remark by the State:
 Whether [appellant] had the actual ability to award anything or not himself, whether he already knew it was going to be awarded to them or not, he is conveying to them that he can and that he will. That's what you to need to focus on here.

an official duty even if the employee knows that he or she does not have technical authority to make the final decision regarding the matter.

In sum, we conclude that, when viewed in their entirety, the jury instructions fairly covered the relevant law on bribery.

## II

Appellant next assigns error to the trial court's decision to allow, over appellant's objection, the testimony of Dallas Evans, a senior official at ISI, indicating that Evans believed that appellant had the ability to influence the awarding of a contract on behalf of the County. According to appellant, Evans expressed a lay opinion not authorized under Maryland Rule 5–701 because "Evans' opinion as to [appellant's] position and authority was neither helpful to the jury nor rationally based on the witness' first-hand observations." Appellant adds that Evans' belief was also irrelevant, because it was appellant's intent and ability to influence the awarding of contracts (for bribery) and his intent to deceive (for conspiracy to commit theft by deception), and not Evans' belief, that mattered. Appellant contends that Evans' testimony was "extremely prejudicial in light of the State's closing argument and the court's erroneous instructions on the elements of bribery."

The State argues that appellant was charged with conspiracy to commit theft by deception and that the effect that appellant's misleading solicitations had on Evans is relevant evidence relating to appellant's intent to deceive. As to bribery, the State argues that it was "permitted to demonstrate that the defendant had the apparent ability to contribute to the desired end," adding, "who better than the victim to testify about whether they [sic] believed the defendant had such ability and the basis for such conclusion?" The State does not address appellant's argument that Evans' comments represented inadmissible lay opinion testimony.

We conclude that, even if this issue is properly preserved, and even if Evans expressed an improper lay opinion, appellant suffered no harm or prejudice as a result of that testimo-

ny and, consequently, a reversal of appellant's conviction is not required. We explain.

A trial court has wide discretion to rule on the relevance of evidence. *See Cook v. State,* 118 Md.App. 404, 416–17, 702 A.2d 971 (1997) (internal citations omitted). Similarly, the decision to admit lay opinion testimony lies within the sound discretion of the trial court. *Robinson v. State,* 348 Md. 104, 118–19, 702 A.2d 741 (1997) (internal citations omitted). In either case, the trial court's decision to admit such evidence will not be overturned unless it is shown that the trial court abused its discretion.

## A. Evans' Testimony

Evans testified that he served as the president of ISI from 2004 to 2005. He described his responsibilities at that time as involving business development matters, primarily providing for, *inter alia,* government clients. In 2004, Melvin Pulley was the director of telecommunications for ISI. During the first week of October 2004, Evans learned that Pulley had been approached by Isom, at the request of appellant, asking if ISI and ADT/Tyco wanted "to play." In addition, Pulley met with appellant and Isom at a restaurant, where it was communicated to Pulley that appellant could guarantee the security management contract for a price of $250,000. At a meeting involving ISI senior management and counsel, the decision was made to report the incident to the "appropriate authorities." Investigators from the Office of the State Prosecutor asked Evans to participate in an investigation by making various telephone calls to appellant. Evans, though reluctant, agreed.

On October 14, 2004, Evans, in the presence of a deputy state prosecutor and other officers, placed a recorded call to appellant. A recording of that call was played for the jury. A transcription of that telephone call was offered by the State as State's Exhibit 16:

EVANS: Okay, ah, what, what are we going to be talking about here? I know ah, Mel's given me a little highlight but, I'm trying to understand exactly what the deal is.

[APPELLANT]: Well I don't want to talk about it on the phone—you understand.

\* \* \*

EVANS: Yeah, give me a rough, ah, yeah, if I don't pick up right away I'm probably sitting in a meeting and I'll have to call you right back.

[APPELLANT]: Okay.

EVANS: [A]nd what not. But ah, ah, I, I do know based on what Mel indicated to me that the ah, the num, we couldn't come up with a number that quick and that soon.

[APPELLANT]: No, no, no, no, no, no we can, we can work with numbers okay.

\* \* \*

EVANS: I see, I see, ah, it, while we're talking about this, what, do you have any sense as to when ah, ah, notification for the ah, ah, security piece is coming out? Cause we've been, we were told 10 days and now its [sic] been moved again.

[APPELLANT]: [I]t will be tomorrow ... that's why I need to talk to you.

EVANS: [Y]ou going [sic] to make an announcement tomorrow[,] okay.

[APPELLANT]: Yeah, I'm going, I'm going to make the decision ... then I'm going to send you a letter ... of intent to award.

Evans further testified that he expected another telephone call from appellant that afternoon, but no call was forthcoming. The following then transpired before the jury:

[THE STATE]: Sir, leading into these two phone calls, these—the first one that was played and the second one that was just played, the message; leading into that, who did you believe [appellant] was?

[APPELLANT'S COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

[THE STATE]: From your personal perspective, sir, who did you believe [appellant] was?

[THE WITNESS]: My understanding was that [appellant]was Deputy Director for Contracts and Procurement for Prince George's County Government.[5]

[THE STATE]: And that knowledge was before making these phone calls?

[THE WITNESS]: Yes.

[THE STATE]: And what did you believe, again, this date and this time; what did you believe was [appellant's] ability to influence the awarding of the contract that you were involved in bidding on?

[APPELLANT'S COUNSEL]: Objection, Your Honor.

THE COURT: Let's approach the bench.

At the bench, the following ensued:

THE COURT: Do you have much more to go on this witness?

[THE STATE]: I have about maybe two minutes.

THE COURT: His beliefs, his understandings, his perceptions are not at issue. The issue is, did this man enter into a conspiracy and accept a bribe.

[THE STATE]: If I may, Your Honor, I respectfully disagree insofar as it's been no secret from the beginning of the case that defense's position that he didn't have actual ability to influence, actual ability to do certain things. And I think it's crucial that the jury hear what these people believed [appellant] could do the whole way. If they believed he had the ability to influence the contract, that would be why he's entering—why he's going into the contract.

---

5. As noted, appellant's actual title was Deputy Director of the Prince George's County Office of Central Services.

This is also, as [the Deputy State Prosecutor] just pointed out to me, we're talking about conspiracy to commit theft by deception. This is evidence of his intent to deceive, as well.

THE COURT: Anything else?

[THE STATE]: No, Your Honor.

THE COURT: You can ask the questions, but let's get it to a close.

This line of questioning then concluded as follows:

[THE STATE]: Mr. Evans, as I just asked you, at that time, what did you believe was the ability of [appellant] to influence the contract that ISI and ADT were bidding on?

[THE WITNESS]: As Deputy Director of Contracts and Procurement, I believed that the position can have influence over or does influence or would influence the awarding of a contract.

Appellant points out that Evans' knowledge of appellant's title was acquired before the October 14, 2004 recorded conversation. Prior to that time, Evans had had no contact with appellant and, according to appellant, "very limited contact with the other alleged co-conspirators."

## B. Lay Opinion Testimony

As an initial matter, we view the preservation of appellant's arguments to be tenuous at best. It is well-established that we will generally not review any issue unless it plainly appears by the record to have been raised in or decided by the court below. Md. Rule 8–131(a). It is also well-settled that a party need not state the grounds for the objection unless requested to by the court. Md. Rule 4–323(c). Where a party asserts specific grounds for an objection, all other grounds not specified by the party are waived. *Klauenberg v. State*, 355 Md. 528, 541, 735 A.2d 1061 (1999).

To be sure, appellant objected generally to Evans' testimony regarding his belief as to appellant's title and his belief as to appellant's ability "to influence the contract that ISI and ADT were bidding on." The trial court conducted a bench conference to consider appellant's objection and his counsel

was conspicuously silent, offering no argument as to the basis for the admission of Evans' testimony. Under these circumstances, appellate review should be limited to the basis on which the trial court decided the matter. At the bench conference, neither the trial court nor the State addressed whether Evans' comments constituted inadmissible lay opinion testimony. Indeed, the issue regarding whether Evans' testimony of his belief as to appellant's ability to influence the awarding of the subject contract even constituted lay *opinion* testimony was never raised or decided. However, even if this issue is preserved for our review, we perceive no prejudice or harm visited upon appellant by Evans' testimony. We explain.

▇▇ An opinion is a belief or view base on an interpretation of observed facts and experience. MERRIAM-WEBSTER'S, NEW INTERNATIONAL DICTIONARY, THIRD EDITION, UNABRIDGED 1582 (1986). Rule 5–701 provides that a "witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." The distinction between fact and opinion is not always clear. *See Bell v. State*, 114 Md.App. 480, 508, 691 A.2d 233 (1997) (quoting the Hon. Joseph F. Murphy, Jr., Maryland Evidence Handbook, § 603(B), at 330 (1993)). In *Robinson*, 348 Md. at 115, 702 A.2d 741, the Court of Appeals explained:

> In distinguishing between opinion testimony, as opposed to testimony detailing solely factual information, this Court has previously defined
>
> > [a]n opinion [as] a belief based upon inferences drawn from ascertained or assumed facts, the soundness of which depends both on the truth of the premises and upon the *knowledge, skill, and intelligence of the witness*, and is to be distinguished from positive knowledge based upon the direct evidence of the senses.
>
> *Baltimore C. & A. Rwy. Co. v. Turner*, 152 Md. 216, 225, 136 A. 609 (1927). This distinction between testimony con-

veying opinion, and testimony merely relating fact, was a product of the common law system of proof, and its exacting "insistence upon the most reliable sources of information." 1 McCormick on Evidence § 10, at 37 (J. Strong ed., 4th ed.1992). *Born of this insistence upon reliability was the evidentiary rule that generally "witnesses are not allowed to testify to their opinions or conclusions on material matters, but must [only] state facts within their knowledge relevant to the issues."*

(Emphasis added).

Irrespective of the purpose for which the State offered Evans' testimony, in order for it to be *opinion* testimony, much less inadmissible, lay opinion testimony, the threshold issue is the manner in which the *purported* opinion was formulated. The prescribed manner in which the opinion is formulated under Maryland Rule 5–701 is through the witness' perceptions.

As stated, the definition in Webster's Dictionary is that an opinion is based on an interpretation of observed facts and experience. Before engaging in an analysis of whether Evans' testimony should have been excluded because it was inadmissible lay opinion evidence, the salient question is whether Evans' testimony as to his "belief" as to what appellant's title was and his authority relative to the awarding of contracts was a result of positive knowledge based upon the direct evidence of the senses, rather than any interpretation or perception of facts or experience.

Initially, the most direct source of Evans' knowledge of appellant's authority is appellant's own representation to Evans in the telephone conversation in which appellant said that he "was going to make the decision." Prior to the investigation conducted by the Office of the State Prosecutor, Evans attended a meeting of the senior management and counsel of ISI, where the decision was made to report the offer of a bribe to the authorities. One may reasonably infer that, during the investigation of appellant, for which Evans was enlisted to make the aforementioned telephone call, Evans was briefed—

providing him with background including information about appellant. Evans' belief that appellant had the authority to influence the awarding of the subject contract emanated, not from any opinion based on perception of facts or interpretation of facts or experience, but rather from what he was told.

Were we to accept appellant's proposition that Evans' testimony constituted lay opinion testimony because he expressed a "belief" as to what appellant's authority in the awarding of contracts was, it would be subject to the provisions of Md. Rule 5–701. Although Evans' testimony may have been admissible on other grounds, a ruling admitting testimony of Evans' belief as lay opinion evidence under Rule 5–701 would have been erroneous. The first requirement set forth in Rule 5–701 is that a witness have first-hand knowledge as to the matter about which he or she expresses an opinion. *See Waddell v. State*, 85 Md.App. 54, 66, 582 A.2d 260 (1990). According to Evans' testimony, he came to the understanding that appellant was the Deputy Director for Contracts and Procurement for Prince George's County before he spoke to appellant by telephone October 14, 2004.[6] While one may not ascertain the authority of a public official from knowledge of a job title alone,[7] as stated, Evans formulated his opinion based

---

6. It was at this juncture that appellant's counsel objected to the State's question as to what Evans believed was "[appellant's] ability to influence the awarding of the contract that you were involved in bidding on." At the bench conference which ensued, the court, opining that Evans' "beliefs, his understandings, his perception are not an issue," permitted the State to asked the question, but, in affirming his belief that the position can have influence over or does influence or would influence the awarding of a contract, Evans never explicitly testified as to the source of the information regarding appellant's position and authority.

7. It is unclear as to why the State was insistent upon asking Evans to explicate appellant's authority. Evans' testimony was unnecessary to establish that appellant had represented to others that he had the actual or apparent ability or authority to influence the awarding of contracts. In the recorded conversation played for the jury, appellant told Evans, "I'm going to make the decision . . . then I'm going to send you a letter . . . of intent to award."

on appellant's representation in their telephone conversation and, one may infer, in his briefings with the state prosecutor.

Moreover, regarding whether Evans' testimony was helpful to the jury's clear understanding of his testimony or determination of a fact in issue, the jury was not tasked to decide Evans' "belief" as to appellant's authority. What was at issue was appellant's authority in the awarding of or influencing of the award of the subject contract and whether that authority bore a relationship to the illegal act.

In order to convict appellant of bribery under C.L. § 9–201(c), the jury was required to find, beyond a reasonable doubt, that appellant was a public employee who demanded or received a bribe or fee for the purpose of influencing his or her performance of official duties. There is no dispute that appellant was a member of a committee tasked with reviewing proposals of various vendors and making recommendations as to the awarding of the security management contract. Nor is it disputed that appellant recommended awarding the contract to ADT/Tyco and ISI.

In addition, numerous witnesses established that appellant approached ISI, either directly or through Wright and Isom, prior to the official awarding of the security management contract, for the purposes of requesting or convincing ISI to enter into a consulting agreement with WBMCG. In addition, the evidence demonstrated that appellant communicated to employees of ISI, either directly or indirectly, that he had the authority and ability to influence the awarding of the contract if ISI agreed to offer something of value to appellant. Finally, appellant, in fact, received a signed consulting agreement and money from ISI, which was deposited in a WBMCG account from which appellant withdrew funds.

The extent of appellant's authority and his role, as a member of the PAG, in the recommendation of which proposal should be accepted, was overwhelmingly established by the evidence. Without the benefit of the issue squarely before him, as the trial judge presciently stated, "[Evans'] beliefs, his understandings, his perceptions are not at issue. The issue is,

did this man enter into a conspiracy and accept a bribe." Evans' testimony, regarding appellant's authority, was superfluous at best. *See Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976).

The resolution of issues presented on appeal are most efficaciously disposed of when they are properly litigated at the trial level. *See* Maryland Rule 8–131. Because counsel failed at trial to raise the issue of whether Evans' testimony constituted inadmissible lay opinion evidence, we do not have the benefit of the court's ruling based on evidence before it and evidence not adduced as to whether Evans' testimony constituted lay opinion evidence.[8] Based upon our review of the record, we do not believe that Evans' "belief" constituted an opinion. Accordingly, the testimony was nothing more than a reiteration of the evidence and therefore cumulative. Assuming, *arguendo,* that the evidence was opinion testimony which failed to comport with the requirements of Maryland Rule 5–701, because, for instance, the fact(s) for which the testimony was offered to clarify a matter for the jury was not determinative of a fact in issue, any error in admitting same would have been harmless beyond a reasonable doubt. *Dorsey,* 276 Md. at 659, 350 A.2d 665. The weight of the evidence supported the jury's conclusion, however, as to each element of the bribery count and Evans' testimony regarding his belief as to appellant's authority in the awarding of contracts was, in this context, inconsequential. We perceive no harm and thus decline to reverse on this basis.

### D. Relevance

As a general rule, evidence is admissible "if it is relevant to the issues in the case and tends either to establish or disprove them." *Cook,* 118 Md.App. at 416, 702 A.2d 971. Evans' statement was generally relevant because it tended to

---

8. Rather than delimit the State's line of questions regarding how Evans learned of appellant's job title, description and authority, the court may have considered and decided the issue of whether Evans' knowledge was acquired from his interpretation, perceptions or inferences drawn from ascertained or assumed facts and whether it was determinative of a fact in issue, rendering his "belief" subject to a Rule 5–701 analysis.

establish that appellant approached ISI, as an official of the County, in a manner that conveyed to ISI that appellant could influence the awarding of the contract. Certainly, relevant evidence may be excludable on other grounds and appellant asks us to find that this particular witness offered inadmissible lay opinion testimony. As explained *supra*, we decline to reverse on that ground.

The State, for its part, cites to *Linden v. United States*, 254 F.2d 560, 565 (4th cir.1958), in support of the proposition that, "where, as here, the indictment charges the defendant with making captious, deceptive, and misleading solicitations, the effect of the solicitations upon the recipients is a highly pertinent fact in determining whether the solicitations are of the nature charged." According to the State, "the testimony of Mr. Evans about his belief was relevant to the conspiracy to commit theft by deception count since it assisted in proving [appellant's] intent," positing that "[t]he jury could have reasonably concluded that [appellant] intended to deceive ISI, as verified by the fact that ISI [Mr. Evans] believed [appellant] and agreed to the demands." Because Evans was participating in an official investigation, it is unclear how Evans was deceived. Nor is it clear how Evans "believed appellant and agreed to [appellant's] demands." The State's relevancy argument, on the other hand, is not persuasive, but, nonetheless, we reemphasize the utter lack of prejudice to appellant.

Appellant, in turn, argues that, if Evans' testimony was in fact relevant to the issue of appellant's intent to deceive, the trial court should have issued a limiting instruction directing the jury not to consider Evans' testimony in its deliberation on the bribery and conspiracy to commit bribery counts. Appellant did not request such an instruction, *see* Md. Rule 5–105, nor do we think one was necessary. We see no reason to reverse appellant's conviction based on the admission of Evans' testimony.

## III

Appellant's final contention is that the trial court erred by denying appellant's motion to dismiss Count II of appellant's

indictment, which charged appellant with the offense of bribery under C.L. § 9–201 as follows:

### ROBERT L. THOMAS and PAUL WRIGHT

at Prince George's County, aforesaid, from on or about September 29, 2004, and continuing through on or about February 11, 2005, the exact days to the Grand Jury being unknown, the said **Robert L. Thomas** being then and there a public employee working for Prince George's County, Maryland in the capacity of Deputy Director of the Department of Central Services, did demand and receive a bribe for the purpose of influencing the said **Robert L. Thomas** in the performance of his official duties in violation of *§ 9–201, Criminal Law Article, Annotated Code of Maryland,* and against the peace, government and dignity of the State.

(Bribery, *§ 9–201, Criminal Law Article, Annotated Code of Maryland* ).

According to appellant, the indictment failed to state an essential element of the crime of bribery—namely, that the bribe must have been demanded or received *from another.* At the close of the State's case, appellant moved to dismiss the bribery count for failure to state an offense. The trial court rejected appellant's argument, stating as follows:

With respect to Count 2, certainly if there was any confusion on behalf of the defendant, he could have filed a motion for a Bill of Particulars, initiated discovery or moved to dismiss. I believe for the reasons expressed by the State, the Count 2 is a count drawn in accordance with the statute.

The State argues that appellant waived this argument by raising it for the first time at the end of the State's case. The State adds that the failure of the indictment to aver that appellant demanded or received a bribe *from another* did not render the indictment defective, because "basic common sense says that 'you cannot bribe yourself.' "

Although we agree with the State that the trial court did not err by denying appellant's motion to dismiss the bribery

count, we reach that conclusion for reasons other than those advanced by the State. We explain.

## A. Preservation

As an initial matter, we hold that appellant did not waive this argument by raising it for the first time at the close of the State's case. The State's waiver argument is not supported by the plain language of Maryland Rule 4–252(d), which provides, in pertinent part, that "[a] motion asserting failure of the charging document . . . to charge an offense may be raised and determined at any time." Appellant argued that the bribery count should be dismissed because it failed to properly charge him with the offense of bribery. He was entitled, under Rule 4–252(d), to raise this allegation at any time. *See Williams v. State*, 302 Md. 787, 792, 490 A.2d 1277 (1985).

## B. Failure to State an Offense

The State is correct, however, in asserting that the trial court did not err when it denied appellant's request to dismiss the bribery count. The Court of Appeals has previously explained:

A primary purpose to be fulfilled by a charging document under the Maryland Law is to satisfy the constitutional requirement of Article 21 of the Declaration of Rights that each person charged with a crime be informed of the accusation against him, first, by characterizing the crime and, second, by so describing it as to inform the accused of the specific conduct with which he is charged.

*Jones v. State*, 303 Md. 323, 326, 493 A.2d 1062 (1985) (internal citations omitted). In addition, Maryland Rule 4–202(a) requires that a charging document "shall contain a concise and definite statement of the essential facts of the offense with which the defendant is charged and, with reasonable particularity, the time and place the offense occurred."

It is well-established that "indictments for statutory offenses are sufficient if laid in the words of the statute," as

long as the statutory words are "sufficient to meet the practical needs which an indictment is intended to supply...." *Cunningham v. State*, 190 Md. 578, 583, 59 A.2d 337 (1948) (internal citations omitted).[9] In *Cunningham*, the Court of Appeals upheld indictments charging a defendant with bribing a police officer because the indictments plainly followed the language of the statute. *Id.* at 583, 59 A.2d 337; *see also Bosco v. State*, 157 Md. 407, 146 A. 238 (1929) (upholding indictment charging defendant with attempting to bribe a justice of the peace on the ground that it tracked the language of the bribery statute, noting that the allegation of knowledge, if required at all for the offense of bribery, was sufficiently implied from a statement of the acts that constituted the offense of bribery); *Tapscott v. State*, 106 Md.App. 109, 127, 664 A.2d 42 (1995) (holding that, an indictment that tracked the language of the statute in charging a defendant with child abuse was sufficient to put the defendant on notice of the charged crime, even though the exact age of the victim was not specified in the charge).

 In this case, appellant's indictment charged him with committing bribery, as codified in C.L. § 9–201, which provides:

(c) A public employee may not demand or receive a bribe, fee, reward, or testimonial to:

(1) influence the performance of the official duties of the public employee; or

(2) neglect or fail to perform the official duties of the public employee.

The indictment alleged that appellant was a "public employee working for Prince George's County, Maryland in the capacity of Deputy Director of the Department of Central Services," and that appellant "did demand and receive a bribe for the purpose of influencing the said [appellant] in the

---

**9.** We note that appellant makes no challenge to sufficiency of the statutory language itself, but rather, argues that the essential elements of bribery were not sufficiently averred in Count II of the indictment.

performance of his official duties in violation of § 9–201, Criminal Law Article...." The indictment thus plainly tracked the language of § 9–201. Moreover, as the State posits, it is implied in the language of the bribery statute that one must demand or receive a bribe from another. One cannot bribe oneself.

For the foregoing reasons, we conclude that the indictment sufficiently characterized the crime of bribery under C.L. § 9–201(c) and, therefore, Count II of appellant's indictment did not fail to state an offense. Accordingly, the trial court did not err in denying appellant's motion to dismiss that charge.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**