702 A.2d 971

**Robert David COOK**

v.

**STATE of Maryland.**

**No. 307, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Dec. 2, 1997.

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for Appellant.

Celia Anderson Davis, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen, Baltimore, and Robert Dean, State's Atty. for Montgomery County, Rockville, on the brief), for Appellee.

Submitted before JOSEPH F. MURPHY, Jr., C.J., and MOYLAN, J., and ROBERT C. MURPHY, J. (Retired, Specially Assigned).

ROBERT C. MURPHY, Judge (Retired, Specially Assigned).

Appellant, Robert Cook, was convicted by a jury sitting in the Circuit Court for Montgomery County (Beard, J., presiding) of second degree murder, involuntary manslaughter, and use of a handgun in commission of a crime of violence. He

was sentenced to thirty years imprisonment for the second degree murder conviction, into which the manslaughter conviction was merged, and a consecutive fifteen-year term for the use of a handgun conviction. Appellant noted a timely appeal and presents two questions for our review:

I. Did the trial court fail to adequately distinguish second degree depraved heart murder and involuntary manslaughter in its instructions to the jury?

II. Did the trial court err in allowing the State to introduce allegedly irrelevant and prejudicial testimony from one of the victim's co-workers?

## FACTS

Appellant and Kathryn Burns, the victim, had a stormy relationship. They were living together when on May 12, 1996, appellant shot the victim once in the upper back, which caused severe internal bleeding. The victim died as a result of that single wound. The record discloses that on the morning of May 12, the victim drank several beers before leaving the apartment she shared with appellant to go to her job at Country Nursery in Burtonsville. Dawn Hale, appellant's daughter, was visiting and during the day, she and appellant decided to cook dinner for the victim as it was Mother's Day. At approximately 4:45 p.m., the victim called the apartment, spoke to Ms. Hale, and informed her that she was running late and would be home in about one-half hour.

The victim had agreed to give a co-worker, Michael Palomo, a ride home that evening. At trial, Mr. Palomo testified that shortly after the victim began working at the nursery, she started giving him rides to and from work. That practice was stopped when it became apparent that appellant strongly disapproved of the arrangement. After Mr. Palomo and the victim left the nursery on the date in question, they stopped at a liquor store where they each purchased a six-pack of beer. They then drove to a park where they sat in the victim's car drinking the beer and talking. A short while later, appellant pulled up in his tow truck, got out of the truck, and retrieved a

metal pipe from the back of the truck. He told Mr. Palomo to get out of the victim's car and when Palomo refused, appellant attempted to open the car door, which was locked. While appellant reached for a second set of keys to the victim's car, the victim started the car and began to drive away. Appellant ran in front of the car and, as the victim drove around him, he swung and hit the driver's side window with the pipe, shattering the window. The victim and Mr. Palomo drove away from the park. Mr. Palomo testified that appellant pursued them in his tow truck. At a stop light, appellant bumped into the victim's car, forcing it into the intersection. Eventually, appellant caught them and cut them off. Mr. Palomo jumped out of the victim's car and ran away from the scene. A stranger drove him home.

On his way home, Mr. Palomo saw the victim talking to two young men whom he had earlier seen in the park and who had witnessed appellant's actions. The victim, with the two young men in the car, then followed Mr. Palomo to his town house. Mr. Palomo, the victim, and the two young men went into the backyard for approximately thirty minutes. The victim departed and, about fifteen minutes later, appellant drove by in his tow truck and yelled to Mr. Palomo, who was still in his backyard with the two young men, "Mickey boy, you better look out. First I'm going to ... kill your girlfriend and then I'm going to come get you." On cross-examination, Palomo admitted that he had informed the police that appellant said to him, "Mikey boy you better watch your back. I'm going to be looking out for you[.]" The two young men testified at trial and corroborated Mr. Palomo's testimony. Mr. Palomo also testified that he and the victim were merely friends.

At trial, Ms. Hale testified that about one hour after the victim telephoned, she had not yet returned to the apartment. Appellant was upset and left the apartment. According to Ms. Hale, appellant returned to the apartment twenty minutes later and handed a pipe, approximately three-feet in length, to her, telling her to rub her hands up and down it. Ms. Hale did so and rubbed the pipe on her shirt, noticing that it had glass on it. Appellant was angry and was yelling. A short

while later, appellant and Ms. Hale left the apartment to look for the victim. As they drove in appellant's tow truck, they saw the victim travelling in her car. Appellant pulled in front of the victim's car, Ms. Hale got out of the tow truck and into the victim's car. The victim wanted to go to the liquor store to purchase additional beer. At appellant's direction, Ms. Hale reported to two police officers that the victim was driving drunk. Eventually, Ms. Hale returned to appellant's tow truck and when they drove past a house, appellant yelled something out the window. Ms. Hale was unable to discern what he said. Appellant and Ms. Hale then returned to the apartment.

When appellant and Ms. Hale entered the apartment, they found the victim sitting on the bed in the bedroom. According to Ms. Hale, the victim was "very quiet" and "looked upset." Ms. Hale added that the victim had been drinking. Ms. Hale described appellant as "[v]ery, very angry." She stated that appellant yelled at the victim over being late and accused her of sleeping with Mr. Palomo. Appellant and the victim had been drinking beer throughout the day and in Ms. Hale's estimation, both were drunk.

Ms. Hale had appellant leave the bedroom and was attempting to speak with the victim when appellant returned and, again, yelled at the victim. Ms. Hale was able to get appellant to leave the bedroom. She then spoke with the victim, telling her that she did not want to be in the middle of their dispute, when appellant retrieved a gun from the linen closet. Appellant entered the bedroom, threw the gun on the bed, and said to Ms. Hale, "Well, then shoot us." Appellant again left the bedroom.

The victim picked up the gun, looked at it, and pulled back the hammer. Ms. Hale asked the victim to put the gun away and the victim placed it under the bed. When appellant returned to the bedroom, Ms. Hale picked up the gun and gave it to him, telling him to put it away. Appellant took the gun and asked who had pulled the hammer back. The victim stated that she had done so. Appellant put the hammer back

down and began to leave the bedroom. He returned and questioned the victim as to why she had pulled the hammer back, asking if she wanted to kill herself. The victim simply shrugged, continued to smoke a cigarette and drink her beer.

Appellant pulled the hammer back and began waving the gun around. Ms. Hale testified that appellant waved the gun in front of the victim's face and yelled at her that she should go ahead and kill herself. Appellant refused Ms. Hale's requests to lay the gun down. According to Ms. Hale, appellant pointed the gun behind the victim, toward a pillow, and it went off. He removed the cylinder rod from the gun and handed the gun to Ms. Hale, telling her to get rid of it. The victim laid back on the bed and it was only then that Ms. Hale realized that the victim had been shot. At appellant's direction, Ms. Hale called for an ambulance, informing the operator that the gun had gone off while appellant was cleaning it.

While they waited for help, appellant told Ms. Hale to tell the police that he had taken the gun from the victim, who was trying to commit suicide, so that no one would get hurt, but that it had gone off while he was disassembling it. When the police arrived, Ms. Hale told the story as instructed by appellant. Detective Peter Picariello subsequently met with Ms. Hale on May 20, 1996, at which time she gave a version of the events, which placed greater culpability upon appellant.

Detective Picariello interviewed appellant on the date of the shooting and following his arrest. At both interviews, appellant informed the detective that the shooting was an accident.

Corporal Evan Thompson testified that in February and March 1996 he had responded three times to the apartment shared by the victim and appellant. The calls were for attempted suicide and domestic disputes. On two occasions, when Corporal Thompson had told appellant that he would not be removing the victim from the apartment, appellant had responded: "If you don't get her out of here, I'm going to kill her."

## DISCUSSION

### I.

█ The trial court instructed the jury on the crime of second degree depraved heart murder, explaining that

[i]t is the killing of another person while acting with an extreme disregard for human life.

And in order to convict the defendant of second degree murder, the State must prove that the conduct of the defendant caused the death of the victim; that the defendant's conduct created a very high degree of risk to the life of the victim; and that the defendant, conscious of such risk, acted with extreme disregard of the life endangering consequences.

The court also instructed the jury on involuntary manslaughter, stating:

In order to convict the defendant of involuntary manslaughter, the State must prove: one, that the conduct of the defendant caused the death of the victim; and that the defendant conscious of the risk, acted in a grossly negligent manner, that is, in a manner that created a high degree of risk to human life.

Appellant claims that the court's instructions failed to adequately distinguish between second degree depraved heart murder and involuntary manslaughter. He stresses that, in defining second degree murder, the trial court did not use the word "malice," but relied upon words that were almost identical to those it used to define involuntary manslaughter. Appellant argues that under these circumstances, explaining the malice element of depraved heart murder was critical. Appellant concedes that he failed to object to the instructions given by the trial court on the grounds he raises on appeal, but asks this Court to address his contentions as plain error.

█ "Under Maryland Rule 4–325(e), we possess plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court." *Danna v. State,* 91 Md.App. 443, 450, 605 A.2d 150, *cert.*

*denied,* 327 Md. 627, 612 A.2d 257 (1992). Plain error is "error which vitally affects a defendant's right to a fair and impartial trial." *State v. Daughton,* 321 Md. 206, 211, 582 A.2d 521 (1990). An appellate court should address an unpreserved error in only those instances which are "compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial." *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980). In deciding whether to exercise our discretion, this Court may consider the egregiousness of the error, the impact on the defendant, the degree of lawyerly diligence or dereliction, and whether the case could serve as a vehicle to illuminate the law. *Austin v. State,* 90 Md.App. 254, 268–72, 600 A.2d 1142 (1992). Nevertheless, "[t]he touchstone remains, as it always has been, ultimate and unfettered discretion." *Id.* at 268, 600 A.2d 1142.

This Court has commented that the distinction between second degree depraved heart murder and involuntary manslaughter of the gross criminal negligence variety is "a very blurred line." *Williams v. State,* 100 Md.App. 468, 482, 641 A.2d 990 (1994). We explained that "[t]here is little distinction between ... [the *mens rea* of involuntary manslaughter] and the *mens rea* of depraved heart murder." *Id.* at 484, 641 A.2d 990. We turn to the cases from the Court of Appeals to divine the distinction between these crimes.

In *Robinson v. State,* 307 Md. 738, 744–45, 517 A.2d 94 (1986), the Court of Appeals quoted from *DeBettencourt v. State,* 48 Md.App. 522, 530, 428 A.2d 479 (1981), when it defined depraved heart murder:

> "It ['depraved heart' murder] is the form [of murder] that establishes that the wilful doing of a dangerous and reckless act with wanton indifference to the consequences and perils involved, is just as blameworthy, and just as worthy of punishment, when the harmful result ensues, as is the express intent to kill itself. This highly blameworthy state of mind is not one of mere negligence.... It is not merely even one of gross criminal negligence.... It involves rather the deliberate perpetration of a knowingly dangerous act

with reckless and wanton unconcern and indifference as to whether anyone is harmed or not."

The Court further stated:

"A depraved heart murder is often described as a wanton and wilful killing. The term 'depraved heart' means something more than conduct amounting to a high or unreasonable risk to human life. The perpetrator must [or reasonably should] realize the risk his behavior has created to the extent that his conduct may be termed wilful. Moreover, the conduct must contain an element of viciousness or contemptuous disregard for the value of human life which conduct characterizes the behavior as wanton."

*Robinson,* 307 Md. at 745, 517 A.2d 94 (quoting Richard Gilbert and Charles Moylan Jr., *Maryland Criminal Law: Practice and Procedure* § 1.6–3 (1983)). It is this level of blameworthiness that fills the place of intent to kill and, thus, malice. *Robinson,* 307 Md. at 744, 517 A.2d 94.

In *State v. Albrecht,* 336 Md. 475, 499, 649 A.2d 336 (1994), the Court of Appeals, quoting from *Mills v. State,* 13 Md.App. 196, 200, 282 A.2d 147 (1971), *cert. denied,* 264 Md. 750 (1972), set forth the elements of involuntary manslaughter:

"It is well settled in this State that where a charge of involuntary manslaughter is predicated on negligently doing some act lawful in itself, the negligence necessary to support a conviction must be gross or criminal, *viz.,* such as manifests a wanton or reckless disregard of human life. A causal connection between such gross negligence and death must exist to support a conviction, although it is not essential that the ultimate harm which resulted was foreseen or intended. On the other hand whether an accused's conduct constituted gross negligence must be determined by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another."

The Court further stated, "In determining whether a defendant's actions constituted gross negligence, we must ask whether the accused's conduct, 'under the circumstances,

amounted to a disregard of the consequences which might ensue and indifference to the rights of others, and so was a wanton and reckless disregard for human life.' " *Albrecht,* 336 Md. at 500, 649 A.2d 336 (quoting *Duren v. State,* 203 Md. 584, 590, 102 A.2d 277 (1954)).

In the present case, there is no need for inclusion of the word "malice" in the instruction on second degree depraved heart murder as it is the high level of blameworthiness, *i.e.,* the high degree of risk to the victim and the defendant's conscious disregard of the life endangering consequences, which takes the place of malice that must be present in offenses requiring an intent to kill. In addition, although both instructions explained that the defendant's conduct had to create a high degree of risk to the life of the victim, the instruction on depraved heart murder also explained that the defendant had to be conscious of the risks and act with extreme disregard for the life endangering consequences. In contrast, in instructing the jury on involuntary manslaughter, the court explained that the defendant had to act only in a grossly negligent manner, that is, a manner creating a high degree of risk to human life. The instructions, thus, adequately conveyed the fine distinction between the two crimes. We also note that the trial court quoted almost verbatim from the Maryland Criminal Pattern Jury Instructions in instructing the jury on the two crimes. We perceive no error, plain or otherwise, committed by the trial court in its jury instructions on second degree depraved heart murder and involuntary manslaughter.

## II.

At trial, Ernest Kalinowsky, the manager of the Country Nursery where the victim was employed, was permitted, over appellant's objection, to testify about the first time he had met appellant. Mr. Kalinowsky stated that shortly after the victim started working at the nursery in March 1996, appellant came to the nursery. Mr. Kalinowsky was questioned about appellant's visit to the nursery and the following exchange occurred:

A [MR. KALINOWSKY:] Ms. Burns had started working at the nursery in the greenhouses. I saw the tow truck pull up into the parking lot, coming in pretty quickly.

I was helping a customer at the time, so I didn't . . . pay any attention, but wasn't parked in such a way that it was . . . I didn't know what the person's intentions were.

I just—I thought maybe he was just parking and looking at something, or then I didn't know, maybe they were going to repossess somebody's vehicle, or—I wasn't sure.

After several minutes, I am not sure—it was probably 10 or 15 minutes, I got done with one of my customers and being one of the duties is to take care of the nursery, I approached the vehicle, and asked that . . . asked if I could help that individual, and it was Mr. Cook.

He asked me—I'm not real articulate, but—I—I can only describe his demeanor as being very con—confrontational.

He said, "Are you the blankety blank getting a ride home from my old lady?" I'd rather not—

Q [STATE'S ATTORNEY:] I want you to use the exact words that Rob Cook used.

A Okay. Can I abbreviate it?

Q That is—

A Okay. He stated, "Are you the MF that's giving my old lady a ride home?" I wasn't sure what he meant, and I said—

Q Now, he did not say "MF", though right?

A That's correct.

Q Did he say, "mother fucker?"

A Yes, ma'am.

Q Okay. Please continue.

A And I wasn't, you know, I didn't know who he was talking about, so then I was taken back. I said, "Excuse me", and then he repeated again, except he said, "God damn" first, "I got to get my old lady home", and I didn't know who he was talking about, and he said, "You know who

my old lady? It's—it's Kathryn. She works in the greenhouse".

I said—I said—I said, "Well, no". Then he said, "What kind of car are you driving?" and I said—I said, "That's my Cadillac right there", and he said, "Well, do you know who's getting a ride from my old lady?"

I believe it was "his old lady". The reason I can remember it, is because I thought, if I would have been that person that was getting a ride home, that he would either told me not to, or I didn't know what was going to—or whether perhaps bodily harm could become me or not, I wasn't sure.

Appellant contends that the trial court abused its discretion in admitting Mr. Kalinowsky's testimony because it was irrelevant to the case. Appellant claims that the information he sought about whom the victim was driving to and from work was irrelevant to his intent two months later at the time of the shooting. He alleges that "Mr. Kalinowsky's testimony really established that [appellant] was a hostile man with a bad temper."

 Evidence is admissible if it is relevant to the issues in the case and tends either to establish or disprove them. Md. Rules 5–401 to 402; *Dorsey v. State,* 276 Md. 638, 643, 350 A.2d 665 (1976). "Evidence is relevant (and/or material) when it has a tendency to prove a proposition at issue in the case." *Johnson v. State,* 332 Md. 456, 472 n. 7, 632 A.2d 152 (1993). "Clearly, the question of whether a given fact is 'material' and thus relevant, depends on the underlying facts of the case. Evidence is material if it tends to establish a proposition that has legal significance to the litigation." *Jackson v. State,* 87 Md.App. 475, 484, 590 A.2d 177 (1991). *See also* Lynn McLain, *Maryland Evidence,* § 401.1 at 261 (1987 & Supp.) ("A material fact is a fact that is of legal consequence to the determination of the issues in the case.") "A ruling on the relevance of evidence is 'a matter which is quintessentially within the wide discretion of the trial judge.'" *Williams v. State,* 99 Md.App. 711, 720, 639 A.2d 180 (1994), *aff'd,* 344 Md. 358, 686 A.2d 1096 (1996) (quoting *Best v. State,* 79 Md.App.

241, 259, 556 A.2d 701, *cert. denied,* 317 Md. 70, 562 A.2d 718 (1989)). "A trial court's determination on relevance will not be reversed by an appellate court absent a clear showing that it abused its discretion." *White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991).

Here, appellant's confrontation with Mr. Kalinowsky was relevant to his state of mind at the time of the shooting. Mr. Palomo had testified that appellant was upset with him and the victim because appellant believed they were carrying on an affair. Mr. Kalinowsky's testimony supported that of Mr. Palomo by demonstrating that appellant disapproved of and was very upset with the victim driving Palomo to and from work. We perceive no abuse of discretion on the part of the trial court in allowing the challenged testimony. We also note that Mr. Palomo offered extensive testimony, without objection by appellant, regarding appellant's anger and upsetness regarding the victim driving Palomo to and from work. Accordingly, even if we were to hold that the trial court abused its discretion in allowing Mr. Kalinowsky to testify regarding the confrontation with appellant, appellant suffered no harm or prejudice from the improperly admitted evidence. *See Johnson v. State,* 303 Md. 487, 528–29, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986) (citation omitted) ("[i]t is a fundamental rule of appellate procedure that a reviewing court will not reverse upon rulings on evidence where the ruling did not result in prejudice to the complaining party"); *Dorsey v. State,* 276 Md. 638, 659, 350 A.2d 665 (1976) (appellate court will not reverse the trial court unless appellant was harmed or prejudiced by that error).

**JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**