*320 BATTAGLIA, J.
This case concerns Maryland’s criminal child neglect statute, Section 3-602.1 of the Criminal Law Article, Maryland Code (2012 Repl. Vol.), which defines “neglect” as “the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor’s physical health or a substantial risk of mental injury to the minor.”[1] The statute carries a penalty of “imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both.” Maryland Code (2012 Repl. Vol), Section 3-602.1(c) of the Criminal Law Article.
Beverly Annetta Hall, the Petitioner, had been convicted by a jury in the Circuit Court for Montgomery County of neglect of her minor son and was sentenced to twenty days’ incarceration. Ms. Hall appealed the judgment of the Circuit Court to the Court of Special Appeals, arguing that the definition of *321 “neglect” contained in Section 3-602.1(a)(5)(i) of the Criminal Law Article was unconstitutionally vague and that the evidence was insufficient to support her conviction. The Court of Special Appeals affirmed the judgment of the Circuit Court, and we granted certiorari to address the following questions:
1. As an issue of first impression, is Md.Code Ann., Crim. Law § 3-602.1, the criminal neglect of a minor statute, unconstitutional because it is vague?
2. Was the evidence sufficient to support conviction for neglect of a minor?
Hall v. State, 444 Md. 638, 120 A.3d 766 (2015). For the reasons that follow, we assume, without having to decide, that the criminal neglect of a minor statute is constitutional but reverse the judgment of the Court of Special of Appeals, because we hold that the evidence was insufficient to support Hall’s conviction for criminal child neglect.
Early in 2013, Beverly Hall was charged by criminal information in the Circuit Court for Montgomery County with one count of neglect of her minor son A.,[2] in violation of Section 3-602.1 of the Criminal Law Article,[3] ostensibly for having, over a two day period, beginning on February 24 and ending on February 26, 2012, left A. under the supervision of his fourteen-year-old sister, D. Ms. Hall filed a motion to dismiss the charge, arguing, among other things, that Section 3-602.1 was unconstitutionally vague, because the statute- “fail[ed] to in *322 form the ordinary person what conduct is prohibited by its enactment[,]” and “fail[ed] to delineate at which point personal parenting choices escalate to neglect, [leading] to arbitrary and discriminatory enforcement.” The motion was denied orally by the circuit court judge who remonstrated that Section 3-602.1 of the Criminal Law Article contained an “awful broad definition of neglect,” but determined that it was not vague:
I understand the argument, and I understand what the defense is saying here and I guess the bottom line is you may win this argument upstairs. I don’t know, but I’m not going to — I just don’t find it to be void for vagueness ... I’m not going to find that the statute is void for vagueness. You know, that’s something the Court of Special Appeals is going to have to do.
The evidence subsequently adduced at trial, taken in the light most favorable to the State,[4] reflected that in the Fall of 2011, Ms. Hall, her fiancé, and three children — two daughters, thirteen-year-old D. and ten-year-old M., and a son, three-year-old A. — were living in a single family home on Lima Drive in Silver Spring, Maryland. Nyree Wannall, a licensed clinical social worker -with Montgomery County Child Welfare, had been providing services to Ms. Hall’s family since May of 2011.[5] Ms. Wannall would perform home visits with Ms. Hall and her family two times monthly, except during the children’s summer vacation when all three visited their maternal grandmother in Florida.
*323 Based on Ms. Wannall’s observations during her home visits, three-year-old A. “ran rampant[,]” “was very, very difficult to control[,]” and was “very active.” Ms. Wannall described A.’s behavior as: “[y]ou would be there during a home visit, and he would pick up something, and it wouldn’t be surprising if he picked something up and threw it at his sister, or threw it at the TV, and just was always moving.” During one of Ms. Wannall’s home visits in September of 2011, A. threw a bottle at his sister’s face, threw a bottle at the T.V., and bit Ms. Wannall’s foot. He then opened the closed front door of the residence, ran outside, and entered the truck of a postal worker who was in the neighborhood, all during the time his mother was present. D., A.’s sister, retrieved A. from the mail truck, and Ms. Hall did not attempt to control or discipline A. during this episode.
During Ms. Wannall’s home visits, she would meet with Ms. Hall and the children and would discuss “issues that may have come up with the individuals in the house[.]” A recurring issue raised during Ms. Wannall’s discussions with Hall was that “[D.] needed to spend her time on her studies in school, needed to be a child and not have as many responsibilities in the home[,]” and “[D.] having too many responsibilities with [A.]” By February 15, 2012, Ms. Hall had agreed with Ms. Wannall that “[A.] was too difficult for [D.] to watch[,]” and that she “would only allow [D.] to watch [M.], her younger sister.”
During the afternoon of Wednesday, February 22, 2012, D. (now fourteen years of age) and M. had finished the school day and went to A.’s babysitter to pick him up. After bringing A. home, D. was upstairs doing her homework, but came downstairs to find that the front door was open and A. was missing; Ms. Hall was not present at 4:30pm that day, Officer Jim Walsh, responding to a call at a different location, found A. without supervision, wearing only a t-shirt and a diaper, whereupon the Officer went looking for A.’s parents. D. and M. approached Officer Walsh and stated that they “didn’t know [A.] got out.” Officer Walsh then brought A. back to the house on Lima Drive and retrieved Hall’s phone number from *324 D. and attempted to call Ms. Hall “at least five” times. He was unable to contact her, and did not recall whether he had left any voicemail messages but left A. under the supervision of D. Ms. Wannall learned of this incident the following day, on February 23, 2012, but did not contact Ms. Hall, as she did not want to interfere with any investigation that might be triggered by Officer Walsh reporting the incident to Child Protective Services.
According to D., A.’s escape from the home on February 22nd was the third time that she had gone to the playground to retrieve him while he was under her supervision. On a previous occasion, although police had been notified, D. was able to retrieve A. before the police arrived at the playground. The police did follow-up, and came to the house on Lima Drive and instructed D. to have Ms. Hall contact them. D., however, did not inform Ms. Hall of any of these occasions on which A. had escaped to the playground.
On Friday, the 24th of February, Ms. Hall and her fiancé attempted to bring the children to their godmother’s home in Prince George’s County, where the children would spend the weekend. Ms. Hall, however, was unable to locate the godmother and returned home.
Once home, the children unpacked their belongings, placed some food in the refrigerator, and got ready for bed by taking baths and changing into their “night clothes.” Ms. Hall did not tell the children where she was going or how long she would be gone, but left an emergency cell phone with D. and told her to call if she needed anything. Ms. Hall also told D. that she would call her “when she [got] to her destination, because she [had] to charge her phone.” Ms. Hall and her fiancé then left at around 10:00 or 11:00 p.m., and D. locked the door behind them.
Following Ms. Hall’s departure, the children began watching a movie in the living room. While watching the movie, A., M., and ultimately D., fell asleep. D. then awoke between midnight and 1:00 a.m. to find that A. was no longer on the couch. D. searched the house for A. to no avail and noticed *325 that the front door to the residence was open. D. attempted to call Hall three to four times, but each of the calls went straight to voicemail. D. also called the fiancé, whose phone number was programmed in the emergency phone, but no one answered. D. thought she heard someone pick up on one of them but the person on the other line hung up shortly thereafter.
After failing to reach her mother, D. called the police and searched the neighborhood, while M. stayed at the house. After D. returned without having found A., she made several additional calls to the police. Two police officers, including Officer Rodney Campbell, arrived around 2:30 am and informed D. that they had found A.
Shortly after 2:00 a.m., Officer Campbell had responded to a call at the intersection of New Hampshire Avenue and Hollywood Avenue (located some 300 to 400 yards from Ms. Hall’s home) and encountered a gentleman pulled over on the side of the road. The man explained to Officer Campbell that he had a baby in his car and that he had almost struck the child, who had been in the middle of the six lane roadway. The child was dressed only in sweatpants and a t-shirt. Officer Campbell, after determining the child’s name was A., contacted other officers and gave out A.’s name and asked whether any of the officers “had dealt with the child before.” Officer Walsh, who had come across A. earlier that week, arrived at the intersection and led Officer Campbell to A.’s home.
After the officers arrived at A.’s home, they attempted to call both Ms. Hall and her fiancé, but were unable to reach either of them. The officers then took the children, including A., to the police station where the officers again were unsuccessful in contacting Ms. Hall. As a result, the officers contacted Child Protective Services (“CPS”) and Laura Erstling, the on-call social worker with the Montgomery County Department of Health and Human Services, Child Welfare Service Program, arrived at the police station around 3:30 a.m. Ms. Erstling instructed the officers to leave a note on the door of the home telling Ms. Hall how to reach her and how to get in touch with the children. Ms. Erstling attempted around 4:00 *326 a.m. to contact Ms. Hall, but was not successful and left a voicemail detailing who she was and how Ms. Hall could reconnect with her children.
Having had no success contacting Hall, Ms. Erstling drove the children to an emergency foster home at 7:30 a.m. Ms. Hall called Montgomery County Child Protective Services at 10:20 am on the morning of February 25, 2012 “to inquire about the whereabouts of her children.”
Ms. Hall then was charged with one count of criminal child neglect in the Circuit Court for Montgomery County. After an initial trial in which the jury had failed to reach a unanimous verdict, the State retried Ms. Hall. A second jury did convict Ms. Hall, after which the Judge imposed a sentence of 20 days’ incarceration. Ms. Hall then noted an appeal to the Court of Special Appeals.
On appeal, Ms. Hall contended that Section 3-602.1 of the Criminal Law Article was void for vagueness and that the evidence was insufficient to support her conviction. The Court of Special Appeals, in an unreported opinion, Beverly Annetta Hall v. State of Maryland, September Term, 2013, No. 2473 (April 21, 2015), affirmed.
The court determined that the statute was “not vague as applied to the facts of the instant case” because “[Hall] was fully aware that D[.] was not a proper caregiver for A[.]”:
A reasonably intelligent person would not have to speculate whether leaving a three year-old alone with an improper caregiver for any length of time, much less overnight, and without an effective way to be contacted in case of an emergency, would constitute neglect as defined in the statute. The statute is not vague as applied to the facts of the instant case.
Id. at 9. The Court of Special Appeals also rejected Hall’s argument that she was inadequately notified of conduct that could violate the statute:
The risk of harm to such a young child, especially one who is “very, very difficult to control,” is not limited to the harm that might come from the child exiting the house and wandering outside unsupervised. There are any number of *327 injuries that could foreseeably result from knowingly leaving an improperly supervised and rambunctious three year-old inside the home as well. [Hall] saw the child throw a dangerous object at people in the home and bite Ms. Wannall on the foot. [A.] also ran out of the house on the day Ms. Wannall was meeting with [Hall] for a home visit. Certainly [Hall] knew or should have known that [A.] could and did leave the house on his own.
Id. at 10-11.
Concerning sufficiency of the evidence, the intermediate appellate court observed that an appellate court must “ ‘view[ ] the evidence, and all inferences fairly deducible from the evidence, in a light most favorable to the State.’ ” Id. at 18-19, quoting Twine v. State, 395 Md. 539, 554, 910 A.2d 1132, 1141 (2006). The Court then remonstrated that Ms. Hall was present on at least one occasion where A. ran out of the house, and Ms. Hall had agreed that D. should not be responsible for A.’s supervision. Furthermore, “despite this agreement, [Hall] intentionally left [D.] in charge of [A.] for an unspecified amount of time, including overnight hours, and did not answer calls in the middle of the night from [D.], nor did [Hall] answer calls or return messages from the police and CPS.” Id. at 19. In light of the above, the court opined that, “there was sufficient evidence before the jury for it to find beyond a reasonable doubt that [Hall] neglected [A.] by intentionally leaving him in the care of [D.] in excess of twelve hours, without any effective means to reach her in case of an emergency.” Id. at 20.
Ms. Hall, before us, initially raises the issue that the “neglect of a minor statute is unconstitutionally vague on its face and as applied to the particular facts of this case[.]” Because we shall hold that there was not sufficient evidence to sustain Ms. Hall’s conviction under Section 3-602.1 of the Criminal Law Article, the criminal child neglect statute, we need not reach the constitutional issue.[6]
*328 The criminal neglect statute, Section 3-602.1 of the Criminal Law Article, provides, in relevant part, that “ ‘Neglect’ means the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor’s physical health or a substantial risk of mental injury to the minor.” Maryland Code (2012 Repl. Vol.), Section 3-602.1(a)(l) (5)(i) of the Criminal Law Article.[7] The intentional failure relates to that of “[a] parent, family member, household member, or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor.”
Although the Court of Special Appeals correctly characterized intent only with reference to whether Ms. Hall failed to provide necessary assistance and resources for the physical health of A., throughout its opinion the court speculated as to the harm that could have befallen A. because of his having been left by Ms. Hall in the care of his fourteen-year-old sister. It is not conjecture about potential harm, however, that governs, but rather whether the conduct at issue, evaluated objectively, created a substantial risk of harm.
“Intentional failure to provide necessary assistance and resources for the physical needs ... of a minor that creates a substantial risk of harm ...” is the pivotal statutory phrase. “[Cjreates a substantial risk” in Section 3-602.1(a)(5)(i) is the same language used in our reckless endangerment statute, Section 3-204 of the Criminal Law Article, Maryland Code (2012 Repl. Vol), which states, in relevant part:
(a) A person may not recklessly:
(1) engage in conduct that creates a substantial risk of death or serious physical injury to another.
*329 The similarity between Section 3-602.1, the criminal child neglect statute, and the reckless endangerment statute, Section 3-204, was noted in testimony in 2011 against the passage of Senate Bill 178, the origin of Section 3-602.1, provided by Melissa S. Rock of Advocates for Children and Youth,[8] who suggested that the proposed child neglect statute was unnecessary because, “[w]e also have a reckless endangerment statute through which a person can be prosecuted for placing another individual at a substantial risk of death or serious physical injury.” The Office of the Public Defender provided similar testimony in opposition to S.B. 178, arguing that the bill “[was] largely duplicative of existing law” by referencing, among other statutes, Section 3-204 of the Criminal Law Article, the reckless endangerment statute, which states that the crime of reckless endangerment is a person acting “recklessly” by “engaging] in conduct that creates a substantial risk of death or serious physical injury to another.”
We set forth the elements of a prima facie case of reckless endangerment in Jones v. State, 357 Md. 408, 427, 745 A.2d 396, 406 (2000), as:
1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly.
The Maryland Criminal Pattern Jury Instruction on reckless endangerment, Section 4:26A, embodies those same elements.[9] *330 In Williams v. State, 100 Md.App. 468, 481, 641 A.2d 990, 996 (1994), the Court of Special Appeals recognized that the purpose of the reckless endangerment statute is to punish conduct that was potentially harmful, even when no actual harm had occurred. (“At the actus reus[10] level, [reckless endangerment] is one element short of consummated harm. At the mens rea level, it is one element short of consummated harm. At the mens rea level, it is one element short of the specific intent necessary for either an attempt or for one of the aggravated assaults.”).
The issue oftentimes plumbed with respect to the actus reus of creating a substantial risk of harm has been whether to measure a defendant’s conduct by a subjective standard or an objective one in order to determine its criminality. Judge Charles Moylan, writing for the Court of Special Appeals in Williams, 100 Md.App. at 495, 641 A.2d at 1003, discussed the subjective-objective dichotomy:
... It is undisputed that the actus reus of creating a substantial risk is to be measured objectively, not subjectively. The mens rea of the defendant, although indispensable to an ultimate finding of guilt, has nothing to do with the establishment of the actus reus. Whether the conduct in issue has, indeed, created a substantial risk of death or serious physical injury is an issue that will be assessed objectively on the basis of the physical evidence in the case.
Judge Moylan’s words have been relied upon in other Court of Special Appeals opinions considering reckless endangerment. See also Marlin v. State, 192 Md.App. 134, 168, 993 A.2d 1141, *331 1161 (2010); Albrecht v. State, 105 Md.App. 45, 85, 658 A.2d 1122, 1141 (1995); Wieland v. State, 101 Md.App. 1, 28, 643 A.2d 446, 459 (1994).
With respect to the evaluation of a defendant’s conduct and the creation of risk, the assessment must be made objectively. The reasonable person standard oftentimes is utilized to measure deviation from the norm, upon which criminal liability is based. Eanes v. State, 318 Md. 436, 462, 569 A.2d 604, 616 (1990) (“The objective ‘reasonable’ test is used in many areas of the law as an appropriate determinant of liability and thus a guide to conduct.”). Essentially, then, the reasonable person standard in criminal law differentiates between carelessness or negligence and criminal misconduct. See State v. Albrecht, 336 Md. 475, 499, 649 A.2d 336, 348 (1994) (citing C.J. Murphy in Mills v. State, 13 Md.App. 196, 200, 282 A.2d 147, 149 (1971), cert. denied, 264 Md. 750 (1972): “... On the other hand whether an accused’s conduct constituted gross negligence must be determined by the conduct itself and not by the resultant harm. Nor can criminal liability be predicated on every careless act merely because its carelessness results in injury to another.”).
Utilizing the objective standard to evaluate the actus reus or conduct of a parent in order to determine a violation of the criminal child neglect statute avoids conjecture with regard to the creation of a substantial risk of harm to the child. The standard to be utilized, then, is whether the parent intentionally failed to provide necessary assistance and resources for the physical needs of the child by acting in a manner that created a substantial risk of harm to the child, measured by that which a reasonable person would have done in the circumstances.
The importance of relying on an objective standard to evaluate parental inaction or neglect lies in the avoidance of “20/20 hindsight” by a jury that can engage in risk distortion. As one commenter on the subject has noted, juries, when faced with evidence of what may have or could have occurred, distort the risk of parental inaction so that all risk becomes *332 substantial. See David Pimentel, Criminal Child Neglect and the “Free Range Kid”: Is Overprotective Parenting the New Standard of Care?, 2012 Utah L. Rev. 947, 988. Professor Pimentel, writing about overprotective parenting, notes that parents, historically, have had little concern for the potential criminality of their parenting decisions, as “the prevailing concern behind parenting choices has been what is best for the child and for the family.” Id. at 967. The shift toward closer scrutiny of parenting choices — the result of both societal and legislative emphases on child protection — has been accompanied by the media sensationalizing the risk to children, according to Professor Pimentel, such that parenting decisions, which necessarily involve parental management of risk to their children, face second-guessing by jurors tasked with determining whether the conduct was, in fact, criminal. Id. at 970-72. Such second-guessing raises the potential that any risk of harm that could be envisioned, aided by 20/20 hindsight, would satisfy criminal culpability in the mind of a jury, according to Professor Pimentel:
If the risk of harm is literally one in a million — in the category of “freak accident” — it would be patently unreasonable to expect any significant investment in precaution against that harm. And yet, every time that freak accident occurs, the parent may face liability for endangerment, as jurors are likely to take the fact of the harm itself as conclusive evidence of its likelihood[.]
Psychologists who study fear have determined a number of reasons that people misperceive risks. Indeed, they note that “perceived risks rarely match the actual risks.”
Id. at 981-83.
After discussing the psychology of a juror’s assessment of risk and factors that contributed to the distortion between actual and perceived risks,[11] Professor Pimentel concludes *333 that, “As already demonstrated, however, juries are ill-equipped to assess, risk, much less to determine when a parent’s poor judgment is sufficiently bad to warrant criminal punishment.” Id. at 987.
The Supreme Court of Kansas, in a child endangerment case, also recognized the potential for bias and distortion in State v. Cummings, 297 Kan. 716, 305 P.3d 556, 565 (2013). In that case, Cummings had provided daycare services for several children in her home and placed one of the children, a thirteen-month old, in a car seat in a bathroom, fastening the child in with the top strap of the car seat but not the bottom strap. Id. at 558. After hearing the child cry for a few minutes and then stop, Cummings assumed the child had gone to sleep, but when she finally did check on the child, he had strangled to death in the car seat. Id. at 559.
The statute under which Cummings was convicted of the crime of involuntary manslaughter during the commission of the crime of endangering a child defined the crime as “intentionally and unreasonably causing or permitting a child under the age of 18 years to be placed in a situation in which the child’s life, body or health may be injured or endangered.” Id. at 561 (emphasis original).
Cummings had challenged the jury instruction which stated, in part:
The elements of endangering a child are as follows:
1. That the defendant intentionally and unreasonably caused or permitted [the child] to be placed in a situation in *334 which there was a reasonable probability that [the child]’s life, body or health would be injured or endangered;
Id. at 560-61, arguing the jury should have been told that “reasonable probability” was more than a faint or remote possibility and that the likelihood of harm will result or the child is placed in imminent peril. Id. at 561. The Supreme Court of Kansas emphasized the effect of “hindsight bias and risk distortion,” reversed Cummings’s conviction and held that the term “reasonable probability” was ambiguous:
The problem associated with this ambiguity is real; a defendant could be convicted based on the jury’s misunderstanding of the level of culpability that our endangering a child statute requires. The severity of this problem increases because of hindsight bias and risk distortion.
id. at 565.
Similarly, the Ohio intermediate appellate court, in State v. McLeod, 165 Ohio App.3d 434, 846 N.E.2d 915 (2006), reversed a conviction for child endangerment based on insufficient evidence. Ohio’s child endangerment statute “provide[d] that no person ... ‘shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.’ ” Id. at 917. The term “substantial risk” was also defined by statute as, “a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist.” Id.
In the case, McLeod had agreed to watch the five year-old daughter of a friend, along with two younger children of another friend; he took a walk around the apartment complex with the younger children after checking on the girl at the playground. Someone reported the girl as unattended, and a deputy sheriff found the child. McLeod was charged and convicted of child endangerment.
The Ohio appellate court reversed and noted that “parents or other child caregivers are not criminally liable for every error in judgment[.]” Id. at 917. Noting that other parents allowed their children to play unsupervised at the playground, the court concluded that checking on a child who was playing *335 with other children in a playground every thirty minutes did not rise to the level of reckless endangerment and stated:
The failure to realize an ideal level of supervisory attention of a child does not equate to acting with heedless indifference to the consequences, thereby perversely disregarding a known strong possibility, as contrasted with a remote or significant possibility, of harm to the health or safety of the child.
Id. at 918.
In State v. Anderson, 108 S.W.3d 680 (Mo.Ct.App.2002), a mother was convicted of second-degree child endangerment after her seven-year-old child, who was disabled, was found naked on a highway. The Missouri child endangerment statute provided that “[a] person commits the crime of endangering the welfare of a child in the second degree if ... [s]he with criminal negligence acts in a manner that creates a substantial risk to the life, body or health of a child less than seventeen years old.” Id. at 682. The State was required to prove that the mother acted with “criminal negligence” that “create[d] a substantial risk to life, body, or health of a child[.]” Id.
The Missouri Court of Appeals reversed the mother’s conviction and opined that, “[while] the failure to properly supervise a child may constitute child endangerment under certain circumstances[,] ... in such cases the failure to act must pose an actual or practically certain risk or danger and not just the potential for risk or danger.” Id. at 683 (internal quotation omitted). The court noted that no evidence had been presented to establish that Anderson failed to supervise her son and that this failure resulted in the child’s ending up in the middle of the highway. Id. Thus, the court concluded:
Any finding that Anderson’s failure to supervise J.A. posed a substantial and unjustifiable risk of danger to J.A. could not have been based upon anything more than mere speculation and conjecture.
Id. Reversing Anderson’s conviction, the appellate court stated, “the evidence presented at trial simply does not establish that any failure by Anderson to supervise J.A. posed a sub *336 stantial risk that J.A. would end up standing in the middle of the highway or that Anderson should have been aware of such a risk.” Id. at 684.
In the present case, conviction for criminal child neglect requires that Ms. Hall’s conduct — leaving her three-year-old son, A., in the care of his fourteen year-old sister— created a “substantial risk of harm” to A.’s physical health and that her conduct was such that a reasonable parent under the circumstances would not have engaged in. The evidence, however, taken in the light most favorable to the State was insufficient to satisfy the standard.
Ms. Hall left her three year-old son, A., a child who was, admittedly, difficult to handle, in the overnight care of his fourteen year-old sister, D., after ensuring that he had been fed and was ready to go to bed. After Ms. Hall and her fiancé departed, the door to the house was locked and the children, including A. and D., fell asleep. The fact that A. was in the care of a fourteen year-old was objectively reasonable taking into consideration that statutorily a thirteen year-old is deemed an appropriate caretaker for a child under eight years of age:
A person who is charged with the care of a child under the age of 8 years may not allow the child to be locked or confined in a dwelling, building, enclosure, or motor vehicle while the person charged is absent and the dwelling, building, enclosure, or motor vehicle is out of the sight of the person charged unless the person charged provides a reliable person at least 13 years old to remain with the child to protect the child.
Maryland Code (1984, 2012 Repl. Vol.), Section 5-801 (a) of the Family Law Article. Although Ms. Hall had agreed with Ms. Wannall not to leave A. under the supervision of D., a fact upon which the Court of Special Appeals relied in its analysis, accord did not convert her agreement to the level of one which had criminal consequences. The main thrust of Ms. Wannall’s concern regarding D. and her supervision of A. was D.’s need to “spend more time on her studies” and “not have as many *337 responsibilities in the home.” Certainly, also, the agreement between Ms. Hall and Ms. Wannall could not have been the basis of a criminal conspiracy. As a result, although it is beyond dispute that Ms. Hall was negligent in not responding to telephone calls from D. and the authorities, she was not guilty of criminal child neglect.
JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY. COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY MONTGOMERY COUNTY.
BARBERA, C.J. and McDONALD, J., concur.
GREENE, WATTS, and HOTTEN, JJ., dissent.

. Section 3-602.1 of the Criminal Law Article provides:
(a)(1) In this section the following words have the meanings indicated.
(2) "Family member” has the meaning stated in § 3-601 of this subtitle.
(3) "Household member” has the meaning stated in § 3-601 of this subtitle.
(4) "Mental injury” means the substantial impairment of a minor's mental or psychological ability to function.
(5)(i) "Neglect” means the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor, (ii) "Neglect” does not include the failure to provide necessary assistance and resources for the physical needs or mental health of a minor when the failure is due solely to a lack of financial resources or homelessness.
(b) A parent, family member, household member, or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not neglect the minor.
(c) A person who violates this section is guilty of the misdemeanor of child neglect and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both.
(d) A sentence imposed under this section shall be in addition to any other sentence imposed for a conviction arising from the same facts and circumstances unless the evidence required to prove each crime is substantially identical.

. We shall refer to Hall’s minor children by their first initials only.

. Section 3-602.1 of the Criminal Law Article provides, in relevant part:
(a)(1) In this section the following words have the meanings indicated.
(5)(i) "Neglect” means the intentional failure to provide necessary assistance and resources for the physical needs or mental health of a minor that creates a substantial risk of harm to the minor's physical health or a substantial risk of mental injury to the minor.
(ii) "Neglect” does not include the failure to provide necessary assistance and resources for the physical needs or mental health of a minor when the failure is due solely to a lack of financial resources or homelessness.

. We have stated that, when reviewing a conviction to determine the sufficiency of the evidence, “the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Smith v. State, 415 Md. 174, 184, 999 A.2d 986, 991 (2010), quoting Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. The reasons for Ms. Wannall's involvement with Hall's family were not disclosed.

. "This Court has emphasized, time after time, that the Court’s ‘strong’ and 'established policy is to decide constitutional issues only when *328 necessary.' " VNA Hospice of Maryland v. Dep’t of Health & Mental Hygiene, 406 Md. 584, 604, 961 A.2d 557, 569 (2008), quoting Burch v. United Cable, 391 Md. 687, 695-696, 895 A.2d 980, 984-985 (2006).

. The State and Ms. Hall agreed that the “mental health” of A. was not the issue in this case.

. Advocates for Children and Youth is an organization that "provide[s] advocacy and impact data as well as personalized stories to help tell the story of Maryland's children in a simple way.” Advocates For Youth, www.acy.org,http://www.acy.org/about-us/who-we-are/ (https://perma. CC/4PLR-T9D5).

. Maryland Pattern Jury Instruction Section 4:26A provides:
The defendant is charged with the crime of reckless endangerment. In order to convict the defendant of reckless endangerment, the State must prove:
(1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another;
*330 (2) that a reasonable person would not have engaged in that conduct; and
(3) that the defendant acted recklessly.
MPJI-Cr § 4:26A Reckless Endangerment (2013 Supp.).

. The Latin term used to describe a criminal act. Every crime must be considered in two parts — the physical act (actus reus) and the mental intent to do the crime (mens rea). Garnett v. State, 332 Md. 571, 577-78, 632 A.2d 797, 800 (1993) ("In this regard, it is well understood that generally there are two components of every crime, the actus reus or guilty act and the mens rea or the guilty mind or mental state accompanying a forbidden act.”)

. Five factors contribute to a juror's distortion of the risk associated with a parent’s action or inaction, according to Professor Pimentel: the *333 ability to assess the likelihood of an occurrence based on the ease with which the juror can think of an example of it; the tendency to ignore higher probability, but less catastrophic risks; the exaggeration of a risk when there is a human element introduced; the impact of media coverage, which overestimates how common a low probability outcome might be; and the lack of appropriate definitions of "reasonable”, which increases the likelihood a juror will deem the parent's action unreasonable in light of the other four factors. David Pimentel, Criminal Child Neglect and the "Free Range Kid”: Is Overprotective Parenting the New Standard of Care?, 2012 Utah L. Rev. 947, 983-87.