*Corey Hannah v. State of Maryland*, No. 1500, Sept. Term 2022. Opinion filed on March 1, 2024, by Wells, C.J.

**ANIMALS – INJURING OR KILLING ANIMALS IN GENERAL – CRIMINAL RESPONSIBILITY**

Under Maryland Code, Criminal Law § 10-606(b)(1)(ii), the intentional torture of an animal constitutes the felony of aggravated animal abuse. Because the statute does not define the word "torture," the legislature intended that "torture" bear its natural and ordinary meaning. An act, omission, or neglect that causes or permits unnecessary or unjustifiable physical pain or suffering to an animal constitutes conduct satisfies the natural and ordinary definition of "torture" for the purpose of the aggravated animal abuse statute.

**ANIMALS – INJURING OR KILLING ANIMALS IN GENERAL – CRIMINAL RESPONSIBILITY**

Evidence that defendant failed to provide sufficient food, water, shelter, and veterinary care for dogs in his care was sufficient to establish criminal liability under aggravated animal abuse statute. Md. Code Ann., Criminal Law, § 10–606(b)(1) (West).

**ANIMALS – INJURING OR KILLING ANIMALS IN GENERAL – CRIMINAL RESPONSIBILITY**

Aggravated animal cruelty was not a specific intent offense, pursuant to section of statute prohibiting the intentional torture of an animal, and the State was therefore not required to prove that the defendant possessed the specific intent to cause animals unnecessary or unjustifiable physical pain or suffering. Md. Code Ann., Criminal Law, § 10–606(b)(1) (West).

**STATUTES – CONSTRUCTION – OTHER LAW, CONSTRUCTION WITH REFERENCE TO – OTHER STATUTES – CONSTRUING TOGETHER; HARMONY**

Harmonious reading of two criminal statutes did not require that a defendant could be convicted of only one offense, where the legislature did not express an intent that conviction of both offenses would frustrate the purpose of either statute or the overall statutory scheme.

Circuit Court for Baltimore County
Case No. C-03-CR-20-002081

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1500

September Term, 2022

_____

COREY HANNAH

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Ripken,
Eyler, James R.,
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wells, C.J.

_____

Filed: March 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

A jury sitting in the Circuit Court for Baltimore County convicted appellant Corey Hannah of four felony counts of aggravated cruelty to animals, under Maryland Code, Criminal Law ("CR") § 10-606, for the torture of four dogs. He was also convicted of thirteen counts of abuse or neglect of animals, pursuant to CR § 10-604. Hannah appeals only his four felony convictions, and presents the following question for our review:

> Whether the court erred in finding that evidence of misdemeanor "abuse or neglect of an animal," is, without more, sufficient to prove the "torture" theory of felony "aggravated cruelty to animals[.]"[1]

Hannah argues that the legislature intended that the type of neglectful conduct that constitutes a violation of CR § 10-604 is not the type of conduct that supports a conviction for intentional animal torture under CR § 10-606. Because the State only presented evidence that any pain and suffering his dogs experienced was caused by his omission or neglect and not his intentional acts, Hannah contends, the State's evidence was insufficient to convict him of aggravated animal cruelty.

For the reasons discussed below, we affirm the circuit court's judgments. The legislature left the term "torture" undefined in CR § 10-606, and, looking to the natural and ordinary meaning of the word, a jury could find Hannah's conduct constituted torture.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 27, 2020, Baltimore County police officers conducted a search of Hannah's property located at 4406 Worthington Avenue in Reisterstown, Maryland. Law

---

[1] The State phrased the question presented differently:

Was the evidence sufficient to support Hannah's convictions for aggravated animal cruelty?

enforcement officers were accompanied by staff associated with the Baltimore County Animal Services Department ("Animal Services"), who seized twenty-six dogs.

On August 10, 2020, a Baltimore County grand jury issued an indictment charging Hannah with four counts of Aggravated Cruelty to Animal, CR § 10-606, in its torture modality, against four pit bull terriers, "Good Girl," "Jonny," "Old Man," and "Charly." Hannah was also charged with four counts of Abuse or Neglect of Animal, CR § 10-604—for failure to provide nutritious food in sufficient quantity, necessary veterinary care, proper drink, and proper space for each of the four dogs—a total of sixteen counts. Hannah was charged with an additional count of CR § 10-604 for failure to provide nutritious food in sufficient quantity to a fifth dog, "Windy," as well as three counts of possession of an implement of dog fighting pursuant to CR § 10-607.1(b).

## I.    Hannah's Trial

Hannah was tried by jury in the Circuit Court for Baltimore County in a two-day trial commencing on July 26, 2022. On the first day of the trial, the State entered Counts 5, 10, 15, and 20, failure to provide proper space, and Counts 22 through 24, possession of implements of dog fighting, nolle prosequi. Hannah entered a plea of not guilty as to the remaining counts.

The State presented four witnesses: Kayla Franczkowski, an Animal Services supervisor; Detective Steven Dix of the Baltimore County Police Department; and Doctors Julianne Simpson, DVM, and Jocelyn Spiga, DVM, Baltimore County Animal Services veterinarians. Hannah presented no witnesses.

2

### A. Testimony Regarding the Search of Hannah's Property.

Franczkowski testified that, between 6:30 and 7:00 a.m. on May 27, 2020, she and three Animal Services staff members accompanied police officers to execute a search warrant at Hannah's residence. Franczkowski testified that other Animal Services staff previously performed inspections since at least 2017 but that she was unaware of the substance of those interactions.

On the property, there was a fenced enclosure containing approximately twenty-six dogs. There was either no water available to the dogs or the water present was not potable, containing debris or algae. Franczkowski testified that there were three dogs chained with heavy chains connected to tire axles, and a mother with puppies in a kennel area. Because of the limited reach of the chains, the dogs that were chained were standing in mixed mud and feces. Franczkowski opined that these conditions could promote fungus, algae, and disease. However, Franczkowski testified that, in general, the dogs were excited and not lethargic.

She observed that Windy, the dog located in the kennel, recently had a litter of puppies, and appeared "a little bit underweight" and friendly. She stated that the vertebrae of Windy's back, her hip bones, and several ribs were showing. She observed a tan pit bull terrier with an abscess on its neck and opined that the dog was in pain because it was jumping and yelping, apparently because of the pressure of its collar on the abscess. She stated that she observed a puncture wound near the abscess and did not know when or how the wound occurred. However, she saw no indication that a veterinarian had treated the abscess.

Franczkowski also observed a dog in Hannah's house with gray fur and scarring on its face and a split lip. Franczkowski stated that she was not sure whether the injuries were recent, and that the lip wound was healed. She observed that Good Girl appeared slower and less "spry" than the other dogs, but noted no apparent wounds, gashes, or injuries. She also said that there was medication from an animal hospital located in a toolbox.

Detective Dix testified that he arrived at Hannah's residence at approximately 10:30 a.m. Dix stated that he observed a fenced enclosure containing multiple pit bull terriers and "makeshift" housing for the dogs. The dogs were collared with "bark collars," (Dix stated that several of the collars were "shocking bark collars.") chained to the ground, and spread apart so that they could not come into contact with each other. Dix testified that there were bowls placed near the dogs, but that he did not see food in any bowl, and that the water available to the dogs was dirty or contaminated. Dix read Hannah his *Miranda* rights, and Hannah voluntarily spoke with Dix, stating that the dogs belonged to him. Dix stated that he located animal medications and growth supplements, specifically, Clovite[2] and Ivermectin,[3] magazines and books on dog breeding, a hanging scale, and syringes.

---

[2] Presumably CLOVITE Conditioner, "[a] vitamin supplement containing Vitamin A, Vitamin D and Vitamin B12" marketed for use with horses. *CLOVITE Conditioner*, Zoetis United States, https://www.zoetisus.com/products/equine/clovite-conditioner [https://perma.cc/LF7W-T5B5].

[3] Ivermectin is an antiparasitic drug. *See* Roz Laing, Victoria Gillan, & Eileen Devaney, *Ivermectin – Old Drug, New Tricks?*, 33 TRENDS IN PARASITOLOGY (6) 463–72 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5446326/ [https://perma.cc/V4LN-TRFD]. Dix testified that it is "typically used in horses, but not always."

He testified that some of the dogs appeared to have open wounds and scarring. On cross examination, Dix stated that he did not know when the scarring occurred. He stated that one dog—which he identified as Old Man—had a split lip and appeared unhealthy.

Franczkowski testified that "a decision was made" to seize all the animals on the property, on the basis of food and water not being available, and the dogs being chained without proper shelter.

## B. Veterinary Expert Testimony.

Dr. Simpson testified that she and Dr. Spiga treated the twenty-six dogs seized at Hannah's property upon their intake at the County animal shelter. The court qualified Dr. Simpson as an expert in the field of veterinary medicine. Dr. Simpson stated that the majority of the dogs had scars, cuts, abrasions, and rub marks on their necks.

Dr. Simpson opined, within a reasonable degree of certainty in veterinary medicine, that five dogs in particular were neglected: Good Girl, Jonny, Old Man, Charly, and Windy.[4] She based that opinion on their "generalized condition." She made particular reference to several "chronic conditions": Charly's ear infection, which "did not happen overnight"; Good Girl's, Old Man's, and Windy's broken and missing teeth; Good Girl's eye infection; and Old Man's untreated split lip. Dr. Simpson stated that she saw evidence of pain in the dogs, and that these five dogs did not receive adequate veterinary care. She also opined that Windy's body condition suggested a lack of nutritious food. However, on

---

[4] As discussed above, the State brought felony charges of aggravated animal abuse with respect to four of the five neglected dogs—Good Girl, Jonny, Old Man, and Charly.

cross examination, Dr. Simpson testified that none of the dogs were dehydrated upon intake at the shelter.

Dr. Spiga performed follow-up examination and treatment on the dogs; the court also qualified her as an expert in veterinary medicine. Dr. Spiga also opined that the five dogs had been neglected, based upon "[t]he untreated medical illnesses that were causing prolonged pain and suffering and the conditions they were kept in." She stated that the shelter was only able to secure veterinary records for Charly but had no knowledge of whether veterinary records existed for the other animals.

Both veterinarians also testified as to their opinions regarding specific dogs, which are recounted as follows.

### 1. *Good Girl*

In her examination of Good Girl, Dr. Simpson noted ocular and ear discharge, hair loss on her ventral neck, lichenified skin, and pendulous mammary glands. Dr. Simpson stated that Good Girl's hair loss may have been painful and that her eye condition may have caused generalized discomfort. She was "missing both of her upper canine teeth and had fractured and worn-down incisors," which Dr. Simpson opined could be painful.

Dr. Spiga testified that she noted abdominal swelling several days after Good Girl's intake. Dr. Spiga diagnosed Good Girl with endometrial cystic hyperplasia, a chronic condition, which Dr. Spiga opined probably caused Good Girl discomfort and pain. She testified that the condition likely persisted for multiple years, but she did not know when Good Girl came into Hannah's possession.

## 2. *Jonny*

Dr. Simpson, upon intake, observed swelling on Jonny's neck, which at the time she believed resulted from an allergic reaction to a bee sting. She stated that the abscess would have taken at least two weeks to fester to its size on May 27, and that it was "absolutely" a painful condition. Dr. Simpson testified that staff at the shelter noticed puncture wounds once he was sedated.

Dr. Spiga also testified to several puncture wounds consistent with puncture from a dog bite on the side of Jonny's face on May 30. She stated that she was unable to drain the fluid in Jonny's abscess because it had "compartmentalized," which, she stated, "shows that it was a chronic condition." She agreed that the condition was "definitely uncomfortable," and that it was likely ongoing for several months. She offered her opinion that Jonny could not possibly have received the puncture wound after he was taken to the animal shelter.

Jonny was ultimately euthanized due to having a wound of unknown origin and exhibiting "bite risk redirecting, freezing hard staring," which, according to Dr. Simpson, suggested the possibility that a rabid animal bit him.

## 3. *Old Man*

Dr. Simpson stated that Old Man exhibited "a lot of scarring," and that he had a split lower lip that appeared to be an old injury. She opined that the lip was allowed to heal without veterinary care and healed unattached, a condition which she stated is painful to a dog while healing. But Old Man, Dr. Simpson further stated, "wasn't bothered by it any longer" at the time she examined him. However, his canine teeth were fractured to the gum

7

line, and he was missing all of his front incisors, which Dr. Simpson opined could be very painful.

Dr. Spiga also opined that Old Man's split lower lip suggested no medical follow-up care, and that it was an "old injury," caused at least several months before. She also noted arthritis and bony swellings around his front carpal joints, which she stated were typically caused by fractures that have not healed appropriately. She stated that Old Man's worn-down teeth could be uncomfortable but stated that she could not tell how much pain it would cause without radiographs of the jaw. Dr. Spiga opined that Old Man's split lip could be uncomfortable.

Old Man was also euthanized because of his "extremely aggressive" behavior towards other animals in the facility rendering him unsafe for release to the public.

4. *Charly*

Dr. Simpson noted that Charly had scarring on her face, muzzle, ears, and neck, and cropped ears. Her left ear was stenotic, "meaning it was completely closed down from ear infection." Dr. Simpson testified that she noted inflammation and discharge from the ear, and that Charly was holding her ear back against her head in a manner suggesting that the condition was painful. She stated that the condition would have taken somewhere in excess of two months to develop, but that she was unsure if veterinary care had already been provided.

Dr. Spiga testified that Charly's left ear canal had been "macerated"—lacerated or destroyed—by some unknown trauma. She opined that it was most likely caused by a bite from another animal, and that the condition was extremely painful.

8

*5. Windy*

Windy had a "very thin body condition score" of 3 on the "Purina 9-Point Body Condition System," which Dr. Simpson testified was an indication that she was underweight. Windy was still bleeding from having had a litter of puppies, which Dr. Simpson stated was normal. With her body condition score low, Dr. Simpson suggested there was a possibility of malnutrition, starvation, or mastitis, but that Windy exhibited no evidence of these conditions. However, she was missing her front incisors and had a fractured upper right canine tooth. Dr. Spiga concurred that Windy was slightly underweight.

Following the close of the State's argument, Hannah moved for a motion for judgment of acquittal on grounds of a lack of evidence of intentional acts constituting torture, which the court denied. The jury returned guilty verdicts as to all counts. Hannah timely appealed.

We will supply additional facts as necessary to support our analysis.

## DISCUSSION

I. **Because CR § 10-606 Does Not Define "Torture," a Jury Could Have Found Hannah's Conduct, in Willfully Failing to Provide Adequate Food, Water, and Veterinary Care for His Dogs, Constituted Torture.**

### A. Parties' Contentions

Hannah argues that the legislature enacting the statutory text now codified at CR § 10-606, in 2001, intended that "torture" includes conduct distinct from that which is criminalized by CR § 10-604. The legislature's intent in so doing, Hannah contends, was

to punish only *intentional acts* of animal cruelty, which would not include the type of "abuse or neglect" penalized by CR § 10-604.

The State responds that we should give "torture" its "ordinary" and "common-sense . . . meaning" because there is no "standalone definition" of the term in the statutory text. According to the State, the proper definition is "to cruelly subject an animal to severe pain or suffering."

## B. Standard of Review

Where we must resolve a question of statutory interpretation, our review is *de novo*. *Moore v. State*, 388 Md. 446, 453 (2005) ("Interpretation of a statute is a question of law, and, therefore, we review de novo the decision of the Circuit Court.").

## C. Analysis

Hannah argues that omissions or neglect in caring for an animal cannot constitute torture, at least where the term is used as a form of the felony of aggravated cruelty to animals pursuant to CR § 10-606(b)(1)(ii). Rather, Hannah argues, the legislature intended that such conduct should only be penalized as abuse or neglect of animals pursuant to CR § 10-604.

*1. Consistent reading of CR §§ 10-604 and 10-606 permits conviction under both statutes for the same conduct.*

Hannah argues that the legislature intended, by enumerating several types of neglect under CR § 10-604(a)(5)—for which he was, in fact, also convicted—that this conduct could only be punished by conviction under that statute. We disagree. It is entirely possible that certain conduct could, theoretically, violate both CR § 10-604 and CR § 10-606 at the

10

same time, and the mere fact that CR § 10-604 is more specific does not preclude a conviction under CR § 10-606. There are scenarios in which the same conduct by the same defendant can sustain convictions under different criminal offenses, even where the statutory language of the two provisions is similar.[5] This may have consequences for whether the charges merge for sentencing, but that does not mean that the defendant cannot be convicted of both. There is nothing in the plain text of either statute to suggest that the legislature intended for the two statutes to be mutually exclusive.

Hannah cites a Texas case, *State v. Kingsbury*, 129 S.W.3d 202 (Tex. App. 2004), as support that Maryland's legislature intended the felony of aggravated animal cruelty and misdemeanor of animal neglect or abuse to cover entirely distinct conduct. In *Kingsbury*, the Court of Appeals of Texas rested its decision upon a technical point of statutory construction, finding it significant that the Texas statute read, "A person commits animal cruelty by intentionally or knowingly torturing an animal 'or' by intentionally or knowingly failing unreasonably to provide necessary food, care, or shelter." *Id.* at 206. Because the word "or" suggested that "a person can commit one criminal act 'or' the other," the *Kingsbury* court concluded that it would be "incongruous" to convict a person for the felony offense of torture. *Id.*

---

[5] A defendant's conduct in a sexual assault case could lead a jury to convict under several different criminal statutes. For example, where a man attempts penile penetration of a female, that act could lead a jury to find the defendant guilty of attempted second-degree rape, third-degree sexual offense, fourth-degree sexual offense, or second-degree assault. *See* CR §§ 3-304, 3-307, 3-308, 3-203. The offenses would undoubtedly merge at sentencing into the main offense of attempted rape.

*Kingsbury* is not instructive. That case interpreted a different statute from that which we consider in this case, enacted by the legislature of another state to serve a purpose which we cannot assume to be precisely the same as our legislature's when it enacted CR § 10-606.[6] Unlike in *Kingsbury*, there is nothing in the plain text of either CR §§ 10-604 or 10-606 to suggest that the legislature intended for their mutual exclusivity. The legislature did not place them in an enumerated list with the word "or" suggesting that misdemeanor neglect *or* felony torture constituted two distinct forms of conduct. In fact, these two offenses *were* found in a single statute, structured somewhat like the Texas statute in *Kingsbury*, prior to a 2002 recodification. CR § 10-606 derives from Article 27 § 59, repealed and reenacted in 2001 to establish aggravated cruelty to animals as a separate offense from the pre-existing misdemeanor offense now codified at CR§ 10-604. In 2002, during the recodification of Article 27 to the current Criminal Law Article, Article 27 § 59(b) became CR § 10-604 and Article 27 § 59(c) became CR § 10-606. The accompanying Revisor's Notes state that no substantive change was intended. However, the legislature breaking the misdemeanor and felony offenses in two separate statutes suggests, if *anything*, that the two offenses were intended to be distinct. We therefore find nothing in the statutory scheme that might evince legislative intent for mutual exclusivity of CR §§ 10-604 and 10-606.

---

[6] For the same reason, we did not consider animal abuse statutes from other states as persuasive authority in our interpretation of CR § 10-606, as Hannah calls upon us to do.

We further disagree with Hannah that reading the two statutes *in pari materia* suggests that the same conduct cannot support each. The canon of *in pari materia* maintains that statutes must be read harmoniously so that no portion of either is rendered nugatory. *See Washington Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 623 (2010) ("statutory provisions that are *in pari materia* (in other words, that deal with the same subject matter) [are interpreted] consistently with each other") (cleaned up); *Whack v. State*, 338 Md. 665, 673 (1995) ("When we are called upon to interpret two statutes that involve the same subject matter, have a common purpose, and form part of the same system, we read them *in pari materia* and construe them harmoniously.") (cleaned up); *Jung v. Southland Corp.*, 351 Md. 165, 177 (1998) ("Nor should [a] statute be read so as to render another statute in that statutory scheme, or any portion of it, meaningless, surplusage, superfluous, or nugatory.") (cleaned up).

Convicting a person of both CR §§ 10-604 and 10-606 renders nothing about either nugatory: the defendant is simply convicted of two offenses. The legislature's intent in penalizing the act of animal torture is in no way impeded if a defendant is also convicted of animal abuse or neglect, and we see nothing unharmonious about such an outcome. Again, we note that there may be consequences for sentence merger in such cases; because Hannah did not raise the issue, we will not consider it.

For the same reason, we do not credit Hannah's argument, citing *Thomas v. Reeves*, 961 F.3d 800, 815–16 (5th Cir. 2020), that to convict him for the same conduct under both CR §§ 10-604 and 10-606 would "duplicate [a] provision" or render one of "no

13

consequence." Again, there is nothing inherently duplicative in convicting a defendant of two offenses.

We now consider whether the plain text of CR § 10-606 evinces, as Hannah suggests, the legislature's intent that "torture" under that provision does not include the omissions criminalized by CR § 10-604.

### 2. *"Torture" is undefined in CR § 10-606, and from the ordinary meaning of the term, a jury could find it includes an intentional omission or neglect.*

We begin our interpretation of CR § 10-606 with its plain text.[7] "The ultimate goal in construing and applying a statute is to 'discern the actual intent of the [L]egislature in enacting it.' When the Court can ascertain the Legislature's intent from the plain meaning of the verbiage, the Court need not delve deeper." *Ali v. CIT Tech. Fin. Servs., Inc.*, 416 Md. 249, 260 (2010). In reading the plain text, we may "neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute[.]" *Washington v. State*, 450 Md. 319, 330 (2016).

The current text of CR § 10-606, in relevant part, reads as follows:

(b) A person may not:
　(1) intentionally:
　　(i) mutilate an animal;
　　**(ii) torture an animal;**
　　(iii) cruelly beat an animal;
　　(iv) cruelly kill an animal; or
　　(v) engage in sexual contact with an animal;

---

[7] Hannah suggests that this Court would violate separation of powers principles by construing the meaning of "torture" as it is used in the statute. However, we need not usurp the legislature's role here; we only *interpret* the statute by determining whether the definition of the term includes the conduct for which Hannah was convicted, an exercise which is squarely within the judicial power.

(2) cause, procure, or authorize an act prohibited under item (1) of this subsection; or

(3) except in the case of self-defense, intentionally inflict bodily harm, permanent disability, or death on an animal owned or used by a law enforcement unit.

Md. Code Ann., CR § 10-606(b) (West 2023) (emphasis added).

"Torture" is undefined by the text of CR § 10-606. That section is set within Title 10, Subtitle 6 of the Criminal Law Article of the Maryland Code, Crimes Relating to Animals, and some terms maintain a consistent definition throughout the subtitle. CR § 10-601, Definitions, hints at the legislature's intended definition of "torture" as used in CR § 10-606. CR § 10-601 offers the following definition for the term "cruelty":

(c)(1) "Cruelty" means the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect.
(2) "Cruelty" includes torture and torment.

Md. Code Ann., CR § 10-601(c) (West 2023).

CR § 10-601 thus does not define "torture" either. However, here, the parties agree that "torture" in CR § 10-606 is at least akin to "cruelty" as defined by CR § 10-601. Hannah cites *In re William G.*, 52 Md. App. 131, 132 (1982), arguing that while torture has been defined to include "act, omission, or neglect whereby unnecessary or unjustifiable physical pain or suffering is caused or permitted" (essentially, cruelty under CR § 10-601), it does not include any "omission" or "neglect" for the purposes of CR § 10-606. The definition in *William G.* derives from Maryland Code, Article 27 § 62, the predecessor of CR § 10-601 repealed in 2002, which *did* provide an explicit definition of "torture."[8]

---

[8] We do not assign any particular weight to the definition found in *In re William G.*, 52 Md. App. at 132, in our consideration of the legislature's intended definition. The

The State proposes that "torture's" definition in this context should be "to cruelly subject an animal to severe pain or suffering." The parties thus generally agree that "torture" could reasonably be defined to mean conduct causing unnecessary or unjustifiable physical pain or suffering, and the crux of their disagreement is what type of conduct qualifies—act, omission, or neglect. We proceed to consider whether either of their definitions is supportable.

When we must construe the meaning of a word for which the legislature has not explicitly provided a definition, "we determine the intended scope of the term by applying the language's natural and ordinary meaning, by considering the express and implied purpose of the statute, and by employing basic principles of common sense, the meaning these words intend to convey." *Goff v. State*, 387 Md. 327, 344 (2005) (citing *Schmerling v. Injured Workers' Insurance Fund*, 368 Md. 434, 444 (2002)).

We turn to dictionary definitions of the word "torture" to guide our interpretation of the statutory text. *See State v. Wilson*, 471 Md. 136, 160 (2020) ("[W]here a term is not defined by statute, we may refer to the dictionary and give the words their ordinary meaning.") (cleaned up). In this case, the available definitions vary widely. Black's Law Dictionary defines "torture" as "[t]he infliction of intense pain to the body or mind to punish, to extract a confession or information, or to obtain sadistic pleasure." TORTURE,

statutory definition was repealed in 2001 and there is no indication in CR §§ 10-601 or 10-606 that the legislature intended that the term retain its pre-2001 definition. We reference it, as Hannah does, as background for his argument about what the definition of torture should *not* include.

16

Black's Law Dictionary (11th ed. 2019).[9] This definition largely does not pertain to an animal abuse context—a dog cannot, of course, be tortured to extract a confession—but the sense of "torture" in which pain is caused to "obtain sadistic pleasure" is relevant.

Other definitions are more expansive. Merriam-Webster's Dictionary provides three definitions of the verb "torture:" "to cause intense suffering to;" "to punish or coerce by inflicting excruciating pain;" and "to twist or wrench out of shape." Merriam-Webster, *Torture*, https://www.merriam-webster.com/dictionary/torture [https://perma.cc/MFB9-P8XX].

Hannah argues that "torture" is necessarily an intentional *act*; that is, that an omission or neglect categorically cannot be the type of conduct that would constitute "torture" for the purpose of CL § 10-606. His theory of the case at trial was that the State presented no evidence that he had committed any intentional act which caused harm to the dogs, an argument he reasserts on appeal.

However, dictionary definitions of "torture" are agnostic about the type of conduct that might constitute torture. In these definitions, we do not find that only an "act," as opposed to an "omission" or "neglect," would constitute torture in its common usage. Taking Merriam-Webster's definition, it is conceivable that a person could "cause intense suffering" by omission or neglect, in addition to an intentional act. The Cambridge Dictionary defines "torture" in its verb form to mean "to cause great physical or mental pain to someone intentionally" or "to cause mental pain." CAMBRIDGE DICTIONARY,

---

[9] This definition was identical at the time that CR § 10-606 was enacted. TORTURE, Black's Law Dictionary (7th ed. 1999).

*Torture*, https://dictionary.cambridge.org/dictionary/english/torture [https://perma.cc/9SES-VUCU]. We also find no indication that the common definition of "torture" has changed substantially since CL § 10-606 was first enacted. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY 2414 (Philip Babcock Grove ed., 3d ed. 1976) (defining torture as "to put to torture; punish or coerce by inflicting excruciating pain;" "to extract or obtain by torture;" "to cause intense suffering to; inflict anguish on; subject to severe pain;" or "to twist or wrench out of shape").

In short, so long as the actor's conduct is intentional,[10] and results in pain and suffering to the animal, the definition applies.[11] We can easily conceive of an intentional omission that would qualify, especially in the context of keeping a domestic pet. A dog's owner may completely control its access to food, water, and medical care; in such circumstances, a person could conceivably make intentional decisions which deprive the animal of necessities and cause it pain and suffering. We thus cannot say that a jury's common-sensical understanding of the word "torture" would not include causing a dog suffering by intentionally omitting to provide proper food, water, shelter, and veterinary care.

---

[10] As we discuss at length below, for the purpose of CR § 10-606, only a showing of general intent is required.

[11] The State suggests that the definition of torture should include that "severe" pain and suffering must be caused to the tortured party. While we think that evidence of the severity of pain can be probative of torture, we find nothing to suggest that a showing of severe pain is necessary to meet the common definition of the term.

**II.** **The State Presented Sufficient Evidence From Which a Jury Could Conclude That Hannah Committed Conduct Which Constituted Torture.**

With this understanding of CR § 10-606 in mind, we turn to consider whether the State presented sufficient evidence to convict Hannah of aggravated animal abuse.

It is a cornerstone of criminal law that "[e]very crime must be considered in two parts—the physical act (*actus reus*) and the mental intent to do the crime (*mens rea*)." *Hall v. State*, 448 Md. 318, 330 (2016) (citing *Garnett v. State*, 332 Md. 571, 577–78 (1993) ("In this regard, it is well understood that generally there are two components of every crime, the *actus reus* or guilty act and the *mens rea* or the guilty mind or mental state accompanying a forbidden act.")). CR § 10-606 is very clear about the mental state required for criminal liability to lie: it is concerned with *intentional* torture.

We consider these two elements, *actus reus* and *mens rea*, in turn.

**A. Standard of Review**

"The standard for appellate review of evidentiary sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. Smith*, 374 Md. 527, 533 (2003) (cleaned up). We make our determination without re-weighing the evidence or unduly intruding upon the factfinder's "findings of facts, its resolution of conflicting evidence, and, significantly, its opportunity to observe and assess the credibility of witnesses." *McDonald v. State*, 347 Md. 452, 474 (1997) (citing *State v. Albrecht*, 336 Md. 475, 478 (1994)).

**B. The State Presented Sufficient Evidence That Hannah Tortured Four Dogs.**

*1. Parties' Contentions*

Hannah argues that no evidence of intentional abuse was presented to the factfinder. He states that there was "no evidence, nor suggestion, that the dogs were intentionally mistreated . . . . that Mr. Hannah beat, maimed, or sought to hurt the dogs . . . . nor allegation of any sadistic or nefarious motivation." The State responds that the jury could have found from the testimony presented at trial that Hannah's failures to secure care for the dogs caused them pain and suffering.

*2. Analysis*

As we have discussed at length, under a definition of torture permissible under CR § 10-606, the State was required to demonstrate that Hannah caused pain and suffering to each of the four dogs. Here, the State adduced ample evidence that the dogs suffered. Drs. Simpson and Spiga testified that Good Girl and Charly suffered from painful and untreated broken teeth, that Good Girl from eye and ear conditions and chronic endometrial cystic hyperplasia; that Jonny had a painful abscess that had gone untreated for at least several weeks or months; that Old Man's lip condition and improperly healed fractures suggested a lack of veterinary attention; that Jonny, Old Man, and Charly exhibited significant scarring; and that Charly's left ear was macerated, inflamed, and painful, and that she experienced stenosis which had gone untreated for months.

In its closing arguments, the State suggested that the manner in which Hannah kept Old Man, taken as a whole, constituted torture:

> And then on top of his face being like torn open and then healing or whatever it is, he's got no teeth. His teeth are destroyed and his teeth are ground down and he's got an ankle that's miserable that he's arthritic and he has a hard time walking. And remember, he's left out in the wood at night with no light, no air conditioning, no sofa, no bed, no toys. Man, he's a prisoner. He is a prisoner who's being tortured, I would argue to you.

> I mean, if that was a person, what would you say about this? And should he be treated like this is your ultimately [*sic*] decision.

The State also argued that Charly's conditions met the definition of torture, with particular reference to her untreated ear condition:

> And if you have half your ear torn off and you had no ear canal and you had big pus inside of it and I let you sit out in the woods with no air conditioning, heat, any comfort, sounds like torture to me. Sounds like cruelty. It sounds like being very cruel.

The State placed further emphasis on the evidence of insufficient veterinary care and its connection to torture:

> Now let's get to torture. And I want you to think about this torture is defined as an act or practice inflicting severe pain and suffering on an animal to be cruel. We know about the pain and suffering. We know that. You've heard evidence of that. You've seen it. You're going to look at the pictures again. It's going to be disgusting. You heard from veterinarians, experts who have been qualified to come in here and tell you their expertise based on years of experience seeing many, many dogs and treating them and alleviating pain and suffering. They would know the best.

We conclude there is no question that the dogs suffered the type of pain and suffering that would support a finding of torture. Consequently, we need only consider if that suffering was properly attributable to Hannah's conduct.

Here, it is undisputed that Hannah acknowledged ownership of the animals. From that, the jury could have rationally inferred that he was responsible for the dogs' care and the manner in which they were kept. It could also have found from Franczkowski's and

21

Dix's testimony that Hannah chained at least three dogs. And, having accepted that, the jury could have rationally found that Hannah's failure to feed, water, shelter, or seek veterinary care for the dogs—or conscious decisions to not provide these for the dogs—caused their pain and suffering.

Both at trial and in this appeal, the State focused upon evidence of the lack of veterinary care as most compelling in establishing that Hannah's conduct caused the dogs to be tortured. We agree, and find that, drawing all permissible inferences in the light most favorable to the State, a rational factfinder could have concluded beyond a reasonable doubt that the dogs' pain and suffering causally flowed from Hannah's conduct. The jury could have credited Dix's testimony that animal medications were discovered in Hannah's residence, and, from that, inferred that Hannah was aware that his dogs required veterinary treatment. And, given the extensive evidence of the dogs' various untreated medical conditions, the jury could have permissibly inferred that Hannah deliberately chose not to seek veterinary treatment for his dogs. We thus hold that the State's evidence was sufficient to meet the *actus reus* element of criminal liability under CR § 10-606.

**C. The State Presented Sufficient Evidence of Hannah's State of Mind.**

*1. Parties' Contentions*

Hannah argues that CR § 10-606 requires a showing of specific intent for criminal liability to lie, and offers that, since there was no evidence of his sadistic intent, the evidence was insufficient to support his conviction. The State argues that the jury could have properly inferred from circumstantial evidence that Hannah's conduct of failing to provide the dogs proper care was intentional.

22

*2. Analysis*

General intent is the intent "to do the [specified] immediate act with no particular, clear or undifferentiated end in mind," whereas specific intent requires a showing of "the additional deliberate and conscious purpose or design of accomplishing a very specific and more remote result." *Chen v. State*, 370 Md. 99, 110 n.5 (2002).

"To determine if a criminal statute requires specific intent, we look first to the language of the statute. If the language alone does not provide sufficient information as to the Legislature's intent, we look to other sources to discern the Legislature's purpose." *Harris v. State*, 353 Md. 596, 606 (1999) (cleaned up). We look for words such as "with intent to" as indication of the legislature's intention to impose a specific intent requirement, and we presume that "when the Legislature desires to create a specific intent crime, it knows how to do so." *Id.* at 606 n.3 (footnote and accompanying text). Here, there is nothing in the statute to suggest that the legislature intended for aggravated animal cruelty to be a specific intent offense. The statute simply criminalizes "intentional" torture without elaboration.

In addition, the legislative history of the 2001 repeal and reenactment of Article 27 § 59, the original source of the current text of CR § 10-606 in substantial part, evinces nothing to suggest that the legislature intended a specific intent requirement. House Bill 649 and Senate Bill 356 from the legislature's 2001 Regular Session simply provide that the legislation was "[for] the purpose of establishing as the felony of aggravated cruelty to animals certain acts relating to the mutilation, torture, killing, or beating of an animal," without elaborating on the mental state required. H.B. 649, 2001 Reg. Sess. (Md. 2001);

23

S.B. 356, 2001 Reg. Sess. (Md. 2001). Nothing else in the legislative history of the bills points to the legislature's intent to enact anything other than what the plain text of the statute stated: that a person may not "intentionally" torture an animal. Md. Code Ann., Art. 27, § 59 (2001).

Following Article 27 § 59(c)'s reenactment as CR § 10-606 in 2002, the only substantive change to date came in 2017, when the legislature amended the text of Subsection (b)(1) to its current form. The enacted legislation, House Bill 455 and Senate Bill 790, stated that the amendment was for the stated purpose of "clarifying that a person who *intentionally* mutilates, *intentionally* tortures, *intentionally* cruelly beats, or *intentionally* cruelly kills an animal is guilty of violating a specified prohibition against aggravated cruelty to animals." H.B. 455, 2017 Reg. Sess. (Md. 2017); S.B. 790, 2017 Reg. Sess. (Md. 2017). And nothing in the legislative history materials available for the 2017 amendment otherwise suggests a legislative intent to impose a specific intent requirement.

As such, there is nothing in the legislative history of CR § 10-606's various amendments from which we might infer that the legislature has ever meant anything other than what it enacted: that the state of mind required under the statute is intentional conduct. In interpreting a statute, we "may neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute; nor may it construe the statute with forced or subtle interpretations that limit or extend its application." *Price v. State*, 378 Md. 378, 387 (2003) (citing *Cnty. Council of Prince George's Cnty. v. Dutcher*, 365 Md. 399, 416–17 (2001)). Finding nothing in the text or history of CR

§ 10-606 to suggest the legislature's intent to require a showing of specific intent, we decline to read such a requirement into the statute.

We note that Hannah's only claim of error with respect to the intent element was that the State failed to present evidence of his specific intent. Having found that no such showing was required, we do not believe that we need to consider the issue further to resolve this case. However, to the extent that we must determine the sufficiency of the State's evidence as to the element of intent, the State need only have proven that Hannah engaged in intentional conduct which caused the harm prohibited under the statute. We therefore need only find that the evidence was sufficient to support a finding that Hannah acted with the requisite mental state—that is, intentionally—and that his intentional conduct resulted in the dogs being tortured.

Intent may generally be proven by circumstantial evidence. See *Thornton v. State*, 397 Md. 704, 714 (2007) ("[T]he substantive mental element . . . can be proven by direct or circumstantial evidence[.]" (citing *Evans v. State*, 28 Md. App. 640, 700–01 (1975))). Where intent is inferred from circumstantial evidence, it is appropriate for the factfinder to base their decision on the particular facts of the case. *State v. Manion*, 442 Md. 419, 434 (2015) (the factfinder is permitted to "consider the facts and circumstances of the particular case when making an inference as to the defendant's intent").

Here, we cannot say that *no* rational factfinder could have found—considering the number of veterinary conditions from which the dogs suffered, the length of time that the conditions persisted, and the undisputed evidence of Hannah's ownership of the dogs— that Hannah intentionally chose to keep the dogs in conditions that prolonged or

25

exacerbated their pain and suffering. Again, here, evidence of Hannah's failure to secure veterinary care for the dogs was most compelling, considered in the light most favorable to the State. The jury could have found, based upon the veterinarians' evidence, that the dogs each suffered from longstanding medical conditions. It could have rationally inferred—from Dix's and Franczkowski's testimony that Hannah possessed animal medications—that he was aware that the dogs required veterinary care. It could have thus inferred that Hannah intentionally chose not to secure veterinary attention for his dogs, and thereby found beyond a reasonable doubt that he possessed the requisite intent. As such, we conclude that there was sufficient evidence of Hannah's intent to torture his dogs.

## CONCLUSION

Hannah's treatment of Charly, Jonny, Old Man, and Good Girl was criminally inadequate and abusive, and Hannah does not, in fact, deny this. His misdemeanor convictions of animal abuse and neglect rested upon the jury's findings that his failure to provide proper care caused unnecessary and unjustified pain, and we have determined that the ordinary meaning of the word "torture" includes such conduct. We therefore conclude that the evidence was sufficient for the jury to find Hannah guilty of aggravated animal cruelty in its torture modality and affirm those convictions.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY IS AFFIRMED. APPELLANT TO PAY THE COSTS.**